## UNITED STATES v. BROOKLYN EASTERN DISTRICT TERMINAL.

### CERTIORARI TO THE CIRCUIT COURT OF APPEALS FOR THE SECOND CIRCUIT.

No. 155.   Argued January 20, 1919.—Decided March 24, 1919.

Whether a carrier is a common carrier within the meaning of the Hours of Service Act, does not depend upon whether its charter declares it to be such, nor upon whether the State of incorporation so considers it, but upon what it does. P. 304.

The fact that a carrier acts only as agent for other carriers may affect its contractual obligations to shippers, but cannot change its obligations, under the Hours of Service Act, concerning the physical operation of its railroad, and the safety of its employees and the public which the act aims to secure. P. 306.

The act must be liberally construed. P. 307.

A navigation company, owner of a terminal consisting of docks, float bridges, warehouses, etc., with delivery and other tracks which crossed a public street and varied individually from a few yards to a mile in length and aggregated 8 miles, was engaged, under separate contracts with interstate railroads, in the reception and delivery there of freight, in carload lots and less (the terminal being named as a reception and delivery station in the tariffs filed by the railroads with the Interstate Commerce Commission), and in transporting the freight on floats between the terminal and the railroad termini, in cars furnished by the railroads, which it hauled between its floats and its reception and delivery tracks, etc., by means of its engines and crews. As agent of the respective railroads, it accepted all freight offered for their lines, issued bills of lading to destination for outgoing freight and receipts for freight delivered to consignees, collected the railroads' tariff charges, where they did not extend credit, adding nothing on its own account, and accounted to them in full. Its compensation, paid by the respective railroads, was determined by weight and origin or destination of goods handled. It owned no cars, and moved none save those mentioned, paid nothing for their use, and did not hold itself out as a common carrier or file tariffs with the Interstate Com-

merce Commission. *Held*, a common carrier within the meaning of the Hours of Service Act, c. 2939, 34 Stat. 1415. P. 304.

Crews engaged in moving at one time a locomotive and seven or eight cars between the docks and the warehouses and team tracks of a terminal company, *held* engaged in the movement of a "train," within the meaning of the Hours of Service Act. § 1. P. 307.

239 Fed. Rep. 287, reversed.

THE case is stated in the opinion.

Mr. *Assistant Attorney General Frierson*, with whom Mr. *Neal L. Thompson* was on the brief, for the United States.

Mr. *Henry B. Closson*, for respondent, in support of the contention that the Terminal is not a common carrier,—because it is not organized and does not hold itself out as such, and because its relations are not with shippers or consignees, but only with the carriers with which it chooses to contract, and its obligations are wholly to the latter and not at all to the former— cited the following: *United States* v. *Ramsey*, 197 Fed. Rep. 144; *Jackson Iron Works* v. *Hurlbut*, 158 N. Y. 34, 38; *United States* v. *Union Pacific R. R. Co.*, 213 Fed. Rep. 332; *Texas & Pacific Ry. Co.* v. *Henson*, 56 Tex. Civ. App. 468; *Kentucky & Indiana Bridge Co.* v. *Louisville & Nashville R. R. Co.*, 37 Fed. Rep. 567, 615, 617; 6 Cyc. 366.

It is immaterial that the Terminal may be subject to the Interstate Commerce Act. It was because of the broad definitions of "railroad" (including terminal facilities), and "transportation," in that act, and because of provisions in the acts of their incorporation, and their control by railroads, that the terminals involved in the following cases were held subject to the Interstate Commerce Act or the Employers' Liability Act. *Southern Pacific Terminal Co.* v. *Interstate Commerce Commission*,

219 U. S. 498; *United States* v. *Union Stock Yard*, 192
Fed. Rep. 330; 226 U. S. 286; *McNamara* v. *Washington
Terminal Co.*, 37 App. D. C. 384. *Terminal Taxicab Co.
v. District of Columbia*, 241 U. S. 252, arose under a stat-
ute subjecting every "public utility" or "common car-
rier" to the orders of a commission, and declaring that
the phrase "common carrier" should be held to include
"every corporation . . . controlling or managing
any agency or agencies for public use for the conveyance
of persons or property within the District of Columbia
for hire." This court held that the Taxicab Company was
an agency for public use for the conveyance of persons
within the District. The decision throws no light upon
the question here whether the Brooklyn Eastern District
Terminal is a common carrier "in the usual and ordi-
nary acceptation of the term." *United States* v. *Ramsey,
supra.*

For similar reasons, decisions sustaining prosecutions
against transportation corporations for violation of the
provisions of the Safety Appliance Act requiring the use
of automatic couplers, grab-irons and draw-bars cannot
properly be cited as decisions that the corporations in
question were "common carriers," for these provisions
relating to cars apply to all cars "used on any railroad en-
gaged in interstate commerce." Amendment of March 2,
1903; *Belt Ry. Co.* v. *United States*, 168 Fed. Rep. 542;
*United States* v. *Union Stockyard & Transit Co.*, 192 Fed.
Rep. 330, 336; *United States* v. *Union Stockyards Co. of
Omaha*, 161 Fed. Rep. 919; 169 Fed. Rep. 404; *Hines* v.
*Stanley G. I. Co.*, 199 Massachusetts, 522.

The Terminal is not "engaged in the transportation of
property by railroad"; and for that reason also is not
subject to the Hours of Service Act. Merchandise in a
car being shunted back and forth over its tracks is not
being "transported by railroad." It is being made ready
for transportation by water to the railroad or is being

delivered after such transportation.   *Taggart* v. *Republic Iron & Steel Co.,* 141 Fed. Rep. 910.

The car floats in their daily movement between its station and the different railroad termini do not constitute "ferries used or operated in connection with any railroad," which the act declares the term "railroad" shall include.   *St. Clair County* v. *Interstate Transfer Co.,* 192 U. S. 454, 467, 468.

The employees were not "actually engaged in or connected with the movement of any train." Aggregations of cars, however many, while in process of being switched in switching yards by switching locomotives, are not "trains"; to be such they must be proceeding on a journey from one point to another on the main line of the railroad. This distinction is made in the following: *United States* v. *Erie R. R. Co.,* 237 U. S. 402; *United States* v. *Chicago, Burlington & Quincy R. R. Co.,* 237 U. S. 410; *La Mere* v. *Railway Transfer Co.,* 125 Minnesota, 159; *United States* v. *Grand Trunk Ry. Co.,* 203 Fed. Rep. 775; *Atchison, Topeka & Santa Fe Ry. Co.* v. *United States,* 198 Fed. Rep. 637; *United States* v. *Pere Marquette R. R. Co.,* 211 Fed. Rep. 220; *Clary* v. *Chicago, Milwaukee & St. Paul Ry. Co.,* 141 Wisconsin, 411; *Lynch* v. *Great Northern Ry. Co.,* 112 Minnesota, 382.

MR. JUSTICE BRANDEIS delivered the opinion of the court.

The Hours of Service Act (March 4, 1907, c. 2939, 34 Stat. 1415) [1] prohibits any common carrier by railroad en-

---

[1] Act of March 4, 1907, c. 2939, 34 Stat. 1415.

"That the povisions of this Act shall apply to any common carrier or carriers, their officers, agents, and employees, engaged in the transportation of passengers or property by railroad . . . from one State . . . to any other State. . . . The term 'railroad' as used in this Act shall include all bridges and ferries used or operated

gaged in interstate commerce from requiring or permitting
an employee to remain on duty for a longer period than
sixteen consecutive hours. For alleged violation of this
provision, proceedings were brought against the Brooklyn
Eastern District Terminal in the District Court of the
United States for the Eastern District of New York. The
defendant contended that it was not a common carrier;
that it was not engaged in interstate commerce by rail-
road; and that its employees were not "connected with
the movement of any train." Upon facts which were
agreed the trial court entered judgment for the Govern-
ment. The Circuit Court of Appeals reversed the judg-
ment on the ground that, while the Terminal was engaged
in interstate commerce and the employment in question
was connected with the movement of trains, it was not a
common carrier. 239 Fed. Rep. 287. The case comes
here on writ of certiorari (243 U. S. 647); and the sub-
stantial question before us is whether the Terminal is
within the scope of the Hours of Service Act, as being a
common carrier. The essential facts are these:

1. The Terminal is a navigation corporation with an
authorized capital stock of one hundred thousand dollars
($100,000), incorporated under § 10 of Article III of the
transportation corporations law of the State of New York,
which reads as follows:

"Seven or more persons may become a corporation, for
the purpose of building for their own use, equipping, fur-
nishing, fitting, purchasing, chartering, navigating or

---

in connection with any railroad, and also all the road in use by any
common carrier operating a railroad, whether owned or operated under
a contract, agreement, or lease; and the term 'employees' as used in
this Act shall be held to mean persons actually engaged in or connected
with the movement of any train.

"Sec. 2. That it shall be unlawful for any common carrier, its
officers or agents, subject to this Act to require or permit any employee
subject to this Act to be or remain on duty for a longer period than
sixteen consecutive hours . . ."

owning steam, sail or other boats, ships, vessels or other property to be used in any lawful business, trade, commerce or navigation upon the ocean, or any seas, sounds, lakes, rivers, canals or other waterways, and for the carriage, transportation or storing of lading, freight, mails, property or passengers thereon."

In its certificate of incorporation, the corporate powers and purposes of the defendant are stated as follows:

"The purposes for which it is formed are to build for its own use, equip, furnish, fit, purchase, charter, navigate, and own steam, sail, and other boats, ships, vessels, and other property, to be used in the business of carrying, transporting, storing, and lading merchandise in New York Harbor and the waters adjacent thereto and connected therewith and the territory bordering thereon."

2. The Terminal operates a union freight station at Brooklyn under individual contracts with ten interstate railroads and several steamship companies. From the railroads it receives both carload and less-than-carload freight and transports the same from their termini to its Brooklyn docks. There, the cars containing such freight are hauled from the car floats by its locomotives and placed for unloading either on its team tracks or at its freight houses. The Terminal receives likewise from shippers both carload and less-than-carload outgoing freight originating at Brooklyn and consigned to points upon the various railroads with which it has contracts. The cars carrying this outgoing freight are then switched and loaded by its locomotives upon its floats and transported by its tugs to the docks of the several railroads.

3. For its services in handling freight as above set forth, the Terminal is paid not by the shipper or consignee, but by the railroad or steamship company upon whose account the transportation service is performed, at the rate of 3 cents per 100 pounds of freight moving to or from points east of the western termini of said railroads, and 4 1-5 cents

per 100 pounds on freight moving to or from points beyond such termini. Upon prepaid shipments from shippers not on the credit lists of the railroads it collects from the shipper at Brooklyn the money and charges for the transportation of such freight from that point to its final destination; and also collects from the consignee at Brooklyn the charges for the transportation of such freight from its point of origin to that place, when such charges have not been prepaid. The freight moneys and charges so received by the defendant from shippers or consignees are accounted for and paid over by it without deduction to the railroads or steamship lines upon whose account they are collected.

4. The Terminal does not hold itself out as a common carrier; nor does it file with the Interstate Commerce Commission any tariffs or concurrences with tariffs, or copies of the contracts with the common carriers by whom it is paid for the transportation of freight, as heretofore set forth. The terminal at Brooklyn is designated by such railroads and rail and water lines, in the tariffs filed by them with the Interstate Commerce Commission, as one of their receiving and delivering stations for freight in the Port of New York; and through bills of lading to such terminal as such station are issued by them on freight to be delivered there. For all freight originating at Brooklyn bills of lading of the railroad or steamship line to which the freight is to be delivered are there issued to the shipper by one of the defendant's employees, who is duly authorized to issue such bills of lading by the railroad or steamship line by which the freight is to be transported to its final destination or destinations after the same is delivered to such railroad or steamship line by defendant.

5. The tracks of the Terminal which extend from its float bridges to several warehouses, coal pockets, platforms, and team tracks have an aggregate length of 8-1/3 miles. One track connecting its several dock and delivery

tracks which is kept clear for operating its switching engines is about one mile in length.   The length of haul effected by its locomotives in moving cars between its float bridges and warehouses, platforms, pockets, and team tracks varies from a few yards to nearly a mile. The number of cars so hauled as part of a movement varies from a single car to eight cars.. As an incident to such movement its locomotives hauling cars cross a public street in Brooklyn.

6. Defendant owns or hires no cars itself, and no cars, except the ones heretofore mentioned, are ever moved over its tracks. For the use of such cars defendant pays no charges; and except by the switching service heretofore described, it transports freight only by water.   It handles interstate and intrastate freight indiscriminately; the larger part being interstate.   It transports no passengers.

7. In connection with the movement of one or more cars between the floats and the loading tracks, warehouses, and team or delivery tracks, defendant employs four to eight switching crews during the day and two at night, each crew consisting of a conductor, engineer and two or more brakemen.

The Hours of Service Act declares (in the first section) that, "The term 'railroad' as used in this Act shall include all bridges and ferries used or operated in connection with any railroad, and also all the road in use by any common carrier operating a railroad, whether owned or operated under a contract, agreement, or lease."   Hence, neither the character of the Terminal's railroad nor its independent ownership excludes it from the scope of the act.   But the Terminal contends that it is not subject to the provisions of the statute, since it is not incorporated as a common carrier and does not hold itself out as such; does not file tariffs; and does not undertake to transport property for all who may apply to have their goods transported; but merely transports as agent such freight as is delivered to

it by or for those carriers, and those only, with whom it
has elected to make special contracts; and that, under
these contracts it performs for the railroads, and not for
the public, a part of the whole carriage which they, as
common carriers, have undertaken with the shipper to
perform.

We need not undertake a definition of the term "com-
mon carrier" for all purposes. Nor are we concerned with
questions of corporate power or of duties to shippers, which
frequently compel nice distinctions between public and
private carriers. We have merely to determine whether
Congress, in declaring the Hours of Service Act applicable
"to any common carrier or carriers, their officers, agents,
and employees, engaged in the transportation of pas-
sengers or property by railroad," made its prohibitions
applicable to the Terminal and its employees engaged in
the operations here involved. The answer to that ques-
tion does not depend upon whether its charter declares
it to be a common carrier, nor upon whether the State of
incorporation considers it such; but upon what it does.
*Terminal Taxicab Co.* v. *District of Columbia*, 241 U. S.
252, 254.

The relation of the Terminal to the several railroads is
substantially the same as that of the terminal considered
in *United States* v. *Baltimore & Ohio R. R. Co.*, 225 U. S.
306; 231 U. S. 274, 288. The transportation performed by
the railroads begins and ends at the Terminal. Its docks
and warehouses are public freight stations of the railroads.
These with its car floats, even if not under common owner-
ship or management, are used as an integral part of each
railroad line, like the stockyards in *United States* v. *Union
Stock Yard Co.*, 226 U. S. 286, and the wharfage facilities
in *Southern Pacific Terminal Co.* v. *Interstate Commerce
Commission*, 219 U. S. 498. They are clearly unlike private
plant facilities. Compare *Tap Line Cases*, 234 U. S. 1, 25.
The services rendered by the Terminal are public in their

nature; and of a kind ordinarily performed by a common carrier. If these terminal operations were conducted directly by any, or jointly by all, of the ten railroad companies with which the Terminal has contracts, the operations would clearly be within the scope of the Hours of Service Law. The evils sought to be remedied exist equally, whether the terminal operations are conducted by the railroad companies themselves or by the Terminal as their agent; and whether the Terminal acts only as such agent for railroads or undertakes in addition to transport on its own account goods for shippers. The precise question presented is, therefore, whether the fact that the Terminal conducts these operations, not as an integral part of a single railroad system but wholly as an agent for one or several, exempts the railroad companies, because they are not the employer and exempts the Terminal, because it is not a common carrier; thus making inapplicable a provision regarding the physical operation of the property devised for the protection of employees and the public

One who transports property from place to place over a definite route as agent for a common carrier may, under conceivable circumstances, be a private carrier. But what is there in the facts above recited to endow the Terminal with that character? The service which it performs is distinctly public in character;—that is, conveying between Brooklyn and points on any of the ten interstate carriers and their connections all property that is offered. The fact that the railroad of the Terminal is short does not prevent it from being a common carrier, *United States* v. *Sioux City Stock Yards Co.*, 162 Fed. Rep. 556; nor does the fact that the thing which it undertakes to carry is contained only in cars furnished by the railroad companies with which it has contracts. Railroads, whose only service is hauling cars for other railroads, have been held liable as common carriers under the Safety Appliance Acts,

*Union Stockyards Co. of Omaha* v. *United States*, 169 Fed. Rep. 404; *Belt Railway Co. of Chicago* v. *United States*, 168 Fed. Rep. 542; and under the Twenty-Eight Hour Law, *United States* v. *Sioux City Stock Yards Co., supra.*[1]

What the Terminal contracts to transport, however, is not primarily cars, but their contents. Its compensation is measured not by the weight, size, or character of the car, but by the weight and the origin or destination of the goods carried therein. These goods the Terminal must, under its contracts with the railroad companies, receive and carry at the rates specified for all who offer them, as fully as the railroad companies do at their other stations. The incidental services performed by the Terminal in respect to these goods are also the same as those performed by the railroad companies at their other stations. For all freight originating at Brooklyn, it issues through bills of lading to destination. Upon prepaid shipments originating there, it collects from the shippers the charges for transportation from Brooklyn to final destination; except where shippers are on the credit lists of the railroad companies. Upon goods arriving over its line at Brooklyn, it collects from the consignees the charges from point of origin, unless these were prepaid. As the Terminal receives both from railroad companies and from shippers also less-than-carload freight, it doubtless performs the loading and unloading, as is done at other railroad stations; and for freight delivered at Brooklyn takes appropriate receipts. In no respect, therefore, does the service actually performed by the Terminal for or in respect to shippers differ from that performed by the railroad companies at their other stations. True, the service is performed by the Terminal under contracts with the railroad companies as agent for them and not on its own account. But a common carrier does not cease to be

[1] Compare also *McNamara* v. *Washington Terminal Co.,* 37 App. D. C. 384, 394, *et seq.; State* v. *Union Stock Yards Co.,* 81 Nebraska, 67.

such merely because the services which it renders to the public are performed as agent for another. The relation of connecting carriers with the initial carrier is frequently that of agent. See *Bank of Kentucky* v. *Adams Express Co.*, 93 U. S. 174. The relation of agency may preclude contractual obligations to the shippers, but it cannot change the obligations of the carrier concerning the physical operation of the railroad under the Hours of Service Act, which as this court has said, must be liberally construed to secure the safety of employees and the public. *Atchison, Topeka & Santa Fe Ry. Co.* v. *United States*, 244 U. S. 336.

It is now admitted that the Terminal is engaged in interstate commerce; and it is clear that at least "switching crews" engaged in moving at one time a locomotive with seven or eight cars between the docks and the warehouses or team tracks, a distance of nearly a mile, are engaged in the movement of a "train." The decisions under the Safety Appliance Acts depend upon the particular context in which the word "train" there occurs, and are not here applicable. Compare *United States* v. *Erie R. R. Co.*, 237 U. S. 402, 407–408.

The judgment of the Circuit Court of Appeals is reversed and that of the District Court affirmed.

*Reversed.*