UNION STOCK YARD & TRANSIT CO. *v.* UNITED STATES ET AL.

No. 40. Argued November 10, 13, 1939.—Decided December 4, 1939.

*Mr. Frederick H. Wood,* with whom *Messrs. Ralph M. Shaw, William F. Riley, Guy A. Gladson, Thomas T. Cooke,* and *Bryce L. Hamilton* were on the brief, for appellant.

*Mr. Daniel W. Knowlton,* with whom *Solicitor General Jackson, Assistant Attorney General Arnold* and *Mr. Elmer B. Collins* were on the brief, for the United States et al.; *Mr. Lee J. Quasey* for National Live Stock Marketing Assn.; and *Mr. Douglas F. Smith,* with whom *Mr. Kenneth F. Burgess* was on the brief, for the intervening railroad companies,—appellees.

MR. JUSTICE STONE delivered the opinion of the Court.

The principal question for decision upon this appeal is whether, in the services performed by appellant in loading and unloading livestock at its stockyards in Chicago, and specified by its tariffs filed with the Interstate Commerce Commission, it is a common carrier subject

to the Interstate Commerce Act, 24 Stat. 379, as amended in 1920, 41 Stat. 474, 49 U. S. C., §§ 1–27.

The case comes here on appeal from the final decree of a district court of three judges,[1] dismissing appellant's suit to set aside an order of the Interstate Commerce Commission, which directed the cancellation of appellant's supplemental schedule proposing cancellation of its rate schedules previously filed with the Commission. Cancellation of Livestock Services, 227 I. C. C. 716. Appellant here, as below, assails the Commission's order on the ground that in performing the scheduled services appellant is not within the jurisdiction of the Commission as defined by the Interstate Commerce Act.

As appears in the Commission's report, appellant was incorporated in 1865 with authority to build and operate a railroad and a stockyard, and with power of eminent domain. Acting under its charter it constructed a stockyard in Chicago and approximately three hundred miles · of railroad tracks, consisting of a main line connecting with the trunk lines entering Chicago and switches to various industries located adjacent to its tracks.

Prior to 1912 it had tried various methods of operating its tracks and stockyards. At that time it did not control any of its railroad properties other than platforms and facilities for loading and unloading at its yard. The Chicago Junction Railway Co., which, with appellant, was controlled by a single holding company, operated the railroad under a fifty-year lease, paying to appellant as rental two-thirds of its net profits. In that year the United States brought suit to restrain appellant and the Junction Company from further operations in interstate commerce until they filed tariffs as required by § 6·of the Interstate Commerce Act. The litigation resulted

---

[1] §§ 210 and 238 (4) of the Judicial Code as amended by the Act of February 13, 1925, c. 229, 43 Stat. 983, 28 U. S. C., §§ 47a, 345.

in the decision of this Court that both were common carriers subject to the Act. *United States* v. *Union Stock Yard & Transit Co.,* 226 U. S. 286. Appellant then filed a rate schedule with the Commission specifying its charges for loading and unloading all rail-borne livestock, and continued its practice of performing services in loading and unloading from and to its livestock pens for the trunk line railroads, charging them the scheduled rates for the service.

In the following year the Junction Company lease was cancelled and a new one executed, under which appellant leased in perpetuity all of its railroad facilities, except those used for loading and unloading livestock, at an annual rental of $600,000 in lieu of a share of the profits. This was followed in 1917 by an attempt by the stockyard to charge shippers an additional amount for the loading and unloading service, which resulted in a reparation award by the Commission, sustained in *Adams* v. *Mills,* 286 U. S. 397. In the same year appellant sought to cancel its tariffs on the ground that by reason of the change in the lease it was no longer a common carrier. This contention was rejected by the Commission. Livestock Loading and Unloading Charges, 52 I. C. C. 209; 58 I. C. C. 164.

In 1922 the Junction Company, with the approval of the Commission, Chicago Junction Case, 71 I. C. C. 631, 150 I. C. C. 32, sublet the road for ninety-nine years, with a renewal option, to the Chicago River & Indiana Railroad Co., whose capital stock was acquired by the New York Central Railroad Company. A renewed attempt by the stockyard to cancel its tariffs failed in 1935, 213 I. C. C. 330, and its 1937 repetition resulted in the like order of the Commission, which is the subject of the present suit.

By ceasing to operate or control its railroad directly or indirectly appellant has restricted its transportation serv-

ice to the loading or unloading of livestock as specified in its tariff. It owns the platforms and chutes which are the necessary and only means of loading and unloading at its yard to and from which the livestock is shipped interstate by rail. For this service it charges the railroads the scheduled rates. Loading and unloading are included in the transportation service rendered by the railroads to shippers, the charge for it to shippers being covered by the line-haul tariffs. The Commission found that appellant's yard is the principal railroad terminal in Chicago for the receipt of livestock in carload lots, and that appellant holds itself out to the public as performing the loading and unloading service and permits it to be performed by no other.

Appellant contends that having divested itself of all control and participation in the operation of its railroad it is no longer within the jurisdiction of the Commission over "common carriers by railroad," conferred by the Interstate Commerce Act, but is subject to regulation by the Secretary of Agriculture, under the Packers and Stockyards Act of 1921, 42 Stat. 159, 7 U. S. C., §§ 181–229.

By § 305 of that Act rates and charges for stockyard services furnished at a stockyard or by a stockyard owner are required to be just and reasonable. And by §§ 309, 310, the Secretary is given authority to regulate such rates. By § 301 stockyard services are defined as "services or facilities furnished at a stockyard in connection with the receiving, buying or selling . . . marketing, feeding, watering, holding, delivery, shipment, weighing, or handling, in commerce, of livestock." It will be noted that the loading and unloading of livestock are not specifically included in the definition of stockyard services. Further, an important exception to the broad authority of the Secretary is made by § 406, which provides: "Nothing in this chapter shall affect the power or the jurisdiction of

the Interstate Commerce Commission, nor confer upon the Secretary concurrent power or jurisdiction over any matter within the power or jurisdiction of such Commission." We accordingly turn to the provisions of the Interstate Commerce Act to determine the extent of the exception.

Section 6(1) of the Interstate Commerce Act provides that a common carrier subject to the provisions of the sections presently to be mentioned, where no joint rate is involved, shall file schedules of rates showing "the separately established rates . . . applied to the through transportation" and requires that the rate schedules shall "state separately all terminal charges . . . and all other charges which the Commission may require, all privileges or facilities granted or allowed, and any rules or regulations which in anywise change, affect or determine any part of the aggregate of such aforesaid rates . . . or the value of the service rendered to the passenger, shipper, or consignee."

Section 1(1) of the Interstate Commerce Act declares: "The provisions of this part shall apply to common carriers engaged in (a) the transportation of passengers or property wholly by railroad . . ." Section 1(3) provides that the term railroad shall include ". . . all the road in use by any common carrier operating a railroad . . . all switches, spurs, tracks, terminals and terminal facilities of every kind used or necessary in the transportation . . . of . . . persons or property . . . including all freight depots, yards or grounds used or necessary in the transportation or delivery of any such property." It defines the term "transportation" as including "locomotives, cars, . . . and all instrumentalities and facilities of shipment or carriage irrespective of ownership, or of any contract, express or implied, for the use thereof, and all services in connection with the receipt, delivery, elevation and transfer in transit . . . and handling of property transported."

Section 15(5) provides, "Transportation wholly by railroad of ordinary livestock in carload lots destined to or received at public stockyards shall include all necessary service of unloading and reloading enroute, delivery at public stockyards of inbound shipments into suitable pens, and receipt and loading at such yards of outbound shipments, without extra charge therefor to the shipper, consignee, or owner . . ."

Without the aid of these statutes the transportation of livestock by rail was held to begin with its delivery to the carrier for loading onto its cars, and to end only after unloading for delivery or tender to the consignee at the place of destination. *Covington Stock-Yards Co.* v. *Keith,* 139 U. S. 128, 136. The same rule has been repeatedly applied since the statute was adopted. *Erie R. Co.* v. *Shuart,* 250 U. S. 465, 468; *Atchison, T. & S. F. Ry. Co.* v. *United States,* 295 U. S. 193, 198, and cases cited; *Denver Union Stock Yard Co.* v. *United States,* 304 U. S. 470; 2 Hutchison, Carriers, 3d ed. § 510. Appellant is thus engaged in the performance of a railroad transportation service and provides railroad "terminal facilities" and services. It is a "carrier" engaged in "transportation of property wholly by railroad" as those terms are defined by the words of the statute.

That appellant's stockyard is a terminal of the line-haul carriers, and that it performs their railroad terminal services within the meaning of the Act was recognized in *Adams* v. *Mills, supra,* 409, and also in *Atchison, T. & S. F. Ry. Co.* v. *United States, supra.* There the Commission's order directing the discontinuance of appellant's yardage charge to consignees was set aside on the sole ground that the Commission's findings failed to show that the service for which the charge was made was any part of the loading or unloading services, or otherwise a service which the rail carrier was bound to furnish.

The statute, it is true, does not purport to say when one who is a railroad carrier because engaged in furnishing railroad terminal facilities and services, is to be deemed a "common carrier." But that question was put at rest in *United States* v. *Brooklyn Eastern District Terminal,* 249 U. S. 296. There a local terminal company rendering terminal services as the agent of numerous rail carriers, was held to be engaged in a public or common calling, and hence to be a common carrier within the meaning of the Hours of Service Act, 34 Stat. 1415, which is applicable to any common carrier by railroad engaged in interstate commerce. Cf. *Southern Pacific Terminal Co.* v. *Interstate Commerce Comm'n,* 219 U. S. 498; *United States* v. *California,* 297 U. S. 175, 181; *United States* v. *Sioux City Stock Yards Co.,* 162 F. 556.

It is not important as appellant seems to think, that, as an incident to the service it renders to shippers and to the line-haul carriers, it acts as agent of the latter. The character of the service, in its relation to the public, determines whether the calling is a public one, and a common carrier does not cease to be such merely because in rendering service to the public it acts as the agent of another. *United States* v. *Brooklyn Eastern District Terminal, supra,* 307. Connecting common carriers frequently act in that capacity for each other without losing their status as such.

Nor is it of weight that the terminal service includes no rail-haul (see *Southern Pacific Co.* v. *Interstate Commerce Comm'n,* 219 U. S. 498) or that operation and control of the terminal facilities are wholly separate from those of any railroad. *United States* v. *Brooklyn Eastern District Terminal, supra,* 305. It is enough that the loading and unloading are rail transportation services performed at a railroad terminal as a common or public calling by one who, in rendering it, engages in the trans-

portation of property by railroad within the meaning of the Act.

*Ellis* v. *Interstate Commerce Comm'n,* 237 U. S. 434, on which appellant relies, does not hold otherwise. There the Commission sought a district court order to compel the examination of witnesses in a proceeding, instituted by the Commission of its own motion, for the investigation of a corporation which leased refrigerator cars to shippers and railroads and maintained icing plants at which it iced the cars, the railroad paying for the icing service. There was no allegation or proof that the corporation was engaged in a common calling or held itself out as ready or willing to supply cars or services on reasonable request. In holding that the case was not an appropriate one for the relief sought because the company was not within the jurisdiction of the Commission, the Court said, p. 443: "It is true that the definition of transportation in § 1 of the act includes such instrumentalities as the Armour car lines lets to the railroads, but the definition is a preliminary to the requirement that the carrier shall furnish them upon reasonable request, not that the owners and builders shall be regarded as carriers, contrary to the truth."

This Court has since recognized that loading and unloading services such as are here involved are common carrier services placed under the authority of the Commission by the Interstate Commerce Act. *Atchison, T. & S. F. Ry. Co.* v. *United States, supra; Denver Union Stock Yard Co.* v. *United States, supra,* 477. And unless the restriction of § 406 of the Packers and Stockyards Act upon the authority of the Secretary of Agriculture in favor of that of the Commission refers to such services, the purpose of the section is not apparent. None other is suggested. See *Atchison, T. & S. F. Ry. Co.* v. *United States, supra,* 199. As we think the statute plainly places

appellant's loading and unloading facilities and services
under the authority of the Commission, they are with-
drawn from the jurisdiction of the Secretary of Agricul-
ture by the terms of § 406 of the Packers and Stockyards
Act,[2] and we find it unnecessary to consider the question,
much argued at the Bar, whether the services could be
more conveniently and advantageously regulated by the
one administrative agency than by the other.

Appellant asks that the order be set aside for want of
the "full hearing" by the Commission, required by
§ 15(7) of the Interstate Commerce Act. In the course of
the hearings before the Commission appellant offered
in a variety of ways to prove the conditions prevailing
at stockyards other than appellant's, and that the Com-
mission had not asserted jurisdiction over loading and

---

[2] If this were doubtful, doubt would be removed by the legislative
history. S. 3944, 66th Congress, in providing a Federal Livestock
Commission to regulate packers and stockyards did not contain such a
saving clause. The House Committee on Agriculture proposed a sub-
stitute bill giving control of the stockyards to the Interstate Commerce
Commission because "the Commission already has control over trans-
portation of cattle, which does not end until they are unloaded at the
yards. . . ." H. Rept. 1297, 66th Cong., 3rd Sess., p. 9.

In the 67th Congress the House Committee on Agriculture proposed
the bill substantially in the form finally adopted as the Packers and
Stockyards Act, containing the saving clause in favor of the Commerce
Commission. The Chairman in introducing the bill in the House said:
"It is proposed to give the Secretary of Agriculture jurisdiction over
the packers, stockyards, commission men, traders, buyers, and sellers,
and all activities connected with the slaughtering and marketing of
livestock and live-stock products in interstate commerce; that is the
Secretary shall have jurisdiction from the time the livestock is un-
loaded at the terminal yards and after it is out of the jurisdiction of
the Interstate Commerce Commission. Up to the time of unloading
the livestock the Interstate Commerce Commission has jurisdiction
over the shipment, distribution, and ownership of stock, refrigerator
cars, and other equipment, and transportation rates, including belt
lines and terminal roads." Cong. Rec., Vol. 61, Part 2. p. 1800.

unloading services performed at those yards. Appellant states that the evidence would have shown that there are one hundred and thirty-five other stockyards in the United States under regulation by the Secretary of Agriculture,[3] which perform loading and unloading services, for which the railroads pay, under conditions similar to those in the Chicago yard; that although, to the knowledge of the Commission, this has been the case for many years, it has not asserted its jurisdiction over any of these yards. This, it is argued, would have established a practical construction of the statute by the Commission, relevant and material to the inquiry because of the rule that a settled or uniform administrative construction of a doubtful statute is of weight in determining its meaning. *Boston & Maine Railroad* v. *Hooker,* 233 U. S. 97; *Pocket Veto Case,* 279 U. S. 655, 688, 689; *Louisville & Nashville R. Co.* v. *United States,* 282 U. S. 740. The exclusion of the proffered evidence by the Commission and its alleged failure to make a proper record of the offer, it is urged, have deprived the appellant of a full hearing.

We think the record adequately shows that the Commission excluded the offered proof as appellant has characterized it here, but we conclude that the Commission was free to reject it. The issue to be resolved in the present proceeding is whether the service rendered by appellant at its Chicago stockyard brought it within the jurisdiction of the Commission. To this issue the practices by others at other yards are irrelevant and their bearing on the administrative construction of the statute

[3] The Secretary has not asserted jurisdiction over the loading and unloading service at public stockyards. Secretary of Agriculture v. Denver Union Stock Yard Co., Bureau of Animal Industry Docket No. 450, p. 10 (1937); see letter to Chairman of Senate Committee on Agriculture and Forestry, Hearings on S. 2129, 75th Cong., 1st Sess., p. 6.

in the present circumstances is, we think, too remote and indecisive to compel a burdensome inquiry into collateral issues.

The Commission has consistently ruled that appellant's loading and unloading services are within its jurisdiction under conditions which appear of record to have remained unchanged since 1922. Appellant is free, as it has been throughout, to show any ruling or action taken by the Commission involving an administrative construction of the statute, although it is plain that in the face of the present record such rulings could not establish a consistent acceptance by the Commission of the construction for which appellant contends. See *United States* v. *Chicago, N. S. & M. R. Co.,* 288 U. S. 1; cf. *Estate of Sanford* v. *Helvering, ante,* p. 39. But mere inaction, through failure of the Commission to institute proceedings under § 15 (7), is not an administrative ruling and does not imply decision as to the Commission's jurisdiction. If the failure to act in the case of yards other than the present one is to be taken as an administrative construction of the statute persuasive here, we would be forced to conclude that a jurisdiction which the statute has plainly conferred either on the Secretary or the Commission, has been lost, although, with respect to this appellant, jurisdiction has been consistently asserted by the Commission, while the Secretary has as consistently remained passive. There is a practical limit to which inquiry into collateral issues may be extended in pursuit of the trivial. We think that limit was reached here.

*Affirmed.*