N. E. ROSENBLUM TRUCK LINES, Inc., v.
UNITED STATES et al.
MARGOLIES v. SAME.

Nos. 599, 601.

District Court, E. D. Missouri, E. D.

Jan. 14, 1941.

J. C. Hopewell, M. E. Aronoff, and Gus O. Nations, all of St Louis, Mo., for plaintiffs.

Thurman Arnold, Asst. Atty. Gen., Harry C. Blanton, U. S. Atty., of Sikeston, Mo., Daniel W. Knowlton, Chief Counsel, Interstate Commerce Commission, of Washington, D. C., Frank Coleman, Sp. Asst. to Atty. Gen., and Nelson Thomas, of Interstate Commerce Commission, of Washington, D. C., for defendants.

Before WOODROUGH, Circuit Judge, and DAVIS and MOORE, District Judges.

PER CURIAM.

The complainants sought certificates of convenience and necessity or permits before the Interstate Commerce Commission on the theory that on July 1, 1935, they were operating as contract carriers by motor vehicles, within the meaning of the Motor Carrier Act, 49 U.S.C.A. § 303, over the route for which application was made, and had so operated since that time.

The Commission denied the applications. The complainants filed separate suits in

the District Court to set aside the orders of the Commission. The cases were heard by a Court composed of three judges under the Motor Carrier Act, 49 U.S.C.A. § 305 (h), and the Act providing for such a Court, 28 U.S.C.A. §§ 46, 47. The two cases were jointly argued and briefed, and will be so treated in this opinion. However, separate findings of fact and conclusions of law are being filed herewith, to which reference is made without extended restatement.

That orders of the nature here involved are reviewable in this Court has been determined in United States v. Maher, 307 U.S. 148, 59 S.Ct. 768, 83 L.Ed. 1162. However, the judicial function is limited to an examination of the record to ascertain whether there is a substantial basis in the evidence for the conclusion of the Commission. Rochester Telephone Corporation v. United States, 307 U.S. 125, 59 S.Ct. 754, 83 L.Ed. 1147.

The Act provides in substance that a contract carrier must secure a permit to operate, but if such carrier or his predecessor in interest were operating on July 1, 1935, over the route for which application is made, and have so operated since that time, the Commission shall issue the permit without further proceedings. 49 U.S.C.A. § 309(a). The complainants sought to avail themselves of this privilege granted by the law. The question is were they contract carriers on July 1, 1935, and have they so operated since that time.

The Interstate Commerce Commission held that the complainants were owner-operators, but were not contract carriers. As their conclusion is understood, it is based upon the theory that complainants merely provided trucks to common carriers, who in the course of operation had exclusive control and dominion of the same.

Smythe Contract Carrier Application, 22 M.C.C. 726, and Dixon Contract Carrier Application, 21 M.C.C. 617, are relied upon as supporting the orders entered in these cases. In the Smythe case the Commission stated the facts as follows: "Under the terms of the lease, which is verbal, the cartage company has complete control and supervision of applicant's equipment, and directs the movement thereof, the same as if the trucks were owned by it. Such equipment is used exclusively in the service of the cartage company and is operated under its name. The upkeep and operating expenses and the drivers' wages

are paid by applicant, the Cartage Company secures all traffic and pays applicant for the use of his equipment, 80 per cent of its rate for the transportation performed. All bills of lading are issued by and in the name of the Cartage Company, which collects the transportation charges, is liable for loss and damage claims, and provides and pays for all insurance and State License tags or fees assessable in any States in which the vehicle is operated. All transactions with shippers are carried on in the name of the cartage company."

On this state of facts the Commission in that case denied a permit to the owner of the equipment.

The salient facts should be mentioned to determine whether the same situation exists in the cases now before the Court.

The complainants, prior to July 1, 1935, and thereafter, owned trucks on which they paid the vehicle license fees, which trucks were used by common carriers to transport freight between St. Louis and Chicago. The shipments went forward in the names of the common carriers, who supervised the loading and unloading of the trucks and collected the charges. Complainants were paid an amount for each trip, dependent upon the weight of the load carried and the compensation derived from its carriage. Complainants carried fire, theft and collision insurance on their equipment, and while public liability and cargo insurance were taken out in the first instance by the common carriers, the cost of such insurance was charged to the complainants. The cargo insurance covered only damage over the sum of $100, and complainants agreed with the carriers to be responsible for damage under that sum, and were in some instances compelled to pay such losses. The drivers of the trucks were employees of complainants, who hired, paid and discharged them. The complainants were free to take any route they chose between the designated points, and there were two or more routes available between the two cities. The common carriers exercised no control over the routing, except to request on occasions that drivers register at certain stations along the road. In some instances the complainants had a full load from one common carrier, and at other times they had fractional loads for one, two or more carriers on the same truck on the same trip. At no time were the trucks of complainants in the exclusive service of any common carrier.

Under these circumstances were complainants contract carriers? The statute defines a contract carrier, 49 U.S.C.A. § 303(a) (15): "The term 'contract carrier by motor vehicle' means any person, not included under paragraph (14) of this section, who or which, under special and individual contracts or agreements, and whether directly or by a lease or any other arrangement, transports passengers or property in interstate or foreign commerce by motor vehicle for compensation."

■ The Act carries its own limitations. The section defining terms used excludes from the operation of the law, "the casual, occasional, or reciprocal transportation of passengers or property in interstate or foreign commerce for compensation by any person not engaged in transportation by motor vehicle as a regular occupation or business." § 303(b). Consequently one who occasionally furnishes equipment for interstate transportation does not come within the Act. It cannot be said that if permits are granted in these cases, they must be granted in every instance where on July 1, 1935, a person or corporation permitted his or its trucks to be used in interstate hauling. The person permitting his trucks to be used must have been engaged in the transportation business as a regular occupation or business. In these cases there is no question but that complainants qualify in this regard.

The defendants contend that the purpose of the "grandfather clause" in the Motor Carrier Act was to allow only those carriers who had been dealing with shippers directly on July 1, 1935, to continue their operations without a determination of convenience and necessity. The Act itself refutes this argument, in that it recognizes that persons often act as brokers of motor transportation, and requires that such persons take out brokers' licenses. Although these persons deal directly with the shippers, they are not required to obtain common or contract carriers' licenses; on the contrary, the Act provides that the persons to whom the brokers turn over their business must have a carrier's license. Section 303(a) (18), U.S.C.A. 49, provides: "The term 'broker' means any person not included in the term 'motor carrier' and not a bona fide employee or agent of any such carrier, who or which, as principal or agent, sells or offers for sale any transportation subject to this chapter, or negotiates for, or holds himself or itself out by solicitation, advertisement, or otherwise as one who sells, provides, furnishes, contracts, or arranges for such transportation."

Section 311(b) provides for the issuance of licenses to brokers upon qualifying under the Act.

■ In thus recognizing that common and contract carriers need not contract directly with the shipping public, but that such contracts may be made through third persons, such as brokers, Congress has shown a clear intention that licensing of carriers should not be affected by the fact that dealings were not had directly with shippers. Nothing in the statute indicates that a carrier must deal directly with the shipper in order to be entitled to a license under the Act.

In United States v. Brooklyn Eastern Terminal, 249 U.S. 296, 39 S.Ct. 283, 63 L.Ed. 613, 6 A.L.R. 527, it was held that the Terminal was a carrier though not organized or held out as such, and though it had not filed tariffs nor undertaken to transport property for all who applied, but merely carried freight as agent for certain railroads with which it had made special contracts. See also United States v. California, 297 U.S. 175, 56 S.Ct. 421, 80 L.Ed. 567; Union Stock Yard & Transit Co. v. United States, 308 U.S. 213, loc. cit. 220, 60 S.Ct. 193, 84 L.Ed. 198. It was not the method of fixing charges, nor the parties with which complainants contracted, but what they did, that characterized their undertaking.

The complainants transported freight in interstate commerce for compensation under agreements with common carriers. They actually engaged in the business of transportation. In so doing they provided the trucks and drivers, paid the license fees for using the highways, and assumed the responsibility for loss or damage to freight entrusted to them. This obligation they discharged both by carrying insurance and by payment of losses. The trucks were not used exclusively by any one common carrier, but by several. Even when called by one carrier, on some occasions the use of the trucks on the particular trip was not limited to the service of that carrier, but the freight of other carriers was transported in the same truck at the same time. These facts show that the control of the equipment was in the hands of complainants, and not in the hands of the common carriers.

470

Complainants were, under the evidence, contract carriers on July 1, 1935, and have so operated since that time. Their status has not been changed by the subsequent extension of their business, as the statute does not restrict the right of the carrier to add to his or its equipment and facilities over the routes, between the termini or within the territory specified in the permit, as the development of the business and the demands of the public shall require. § 309(b)

The statute says if they transport freight under special agreements "directly or by a lease or any other arrangement" for compensation, they are contract carriers. This language is broad. Congress purposely so provided. It may be that the administrative process would be simpler had the statute been made to read otherwise. It might have been better to further limit the number of motor carriers, but this is not for the Court to say. Congress enacted the statute; it means what it says.

The conclusion seems inevitable that the common carriers did not have exclusive control of and dominion over the trucks of complainants while they were engaged in the transportation business, and that the conclusion of the Commission to that effect has no substantial basis in the evidence offered.

The prayer of the complainants will be granted to the extent of setting aside the orders entered. Judgments accordingly may be tendered for approval, signature and entry.