## WASHINGTON UNIVERSITY v. UNITED STATES et al.

No. 2669.

District Court, E. D. Missouri, E. D.

June 21, 1945.

Richard S. Bull, of St. Louis, Mo., for plaintiff.

Harry C. Blanton, U. S. Dist. Atty., of Sikeston, Mo., Russell Vandivort, Asst. U. S. Dist. Atty., of St. Louis, Mo., and Paul S. McMahon, Sp. Asst. to the Atty. Gen.

(Samuel O. Clark, Jr., Asst. Atty. Gen. and Andrew D. Sharpe, Sp. Asst. to the Atty. Gen. on the brief), for the Government.

Stewart D. Flanagan, of St. Louis, Mo., and James L. Crawford, of Cincinnati, Ohio, for intervening defendants.

HULEN, District Judge.

The complaint is in two counts. Count One seeks recovery of employers' tax paid by the plaintiff for the five quarterly periods ending September 30 and December 31, 1940, and March 31, June 30, and September, 30, 1941, under Subchapter B of Chapter IX of the Internal Revenue Code, 26 U.S.C.A. Int.Rev.Code, § 1500 et seq. (formerly the Carriers' Taxing Act of 1937). Count Two of the Complaint seeks recovery of sums paid under the same law, representing employees' taxes, for the same period.

The question presented for decision under the pleadings and record is whether plaintiff, in its operations of Cupples Station, in St. Louis, Missouri, is a common carrier and therefore an employer within the meaning of Subchapter B of Chapter IX, Internal Revenue Code.

Plaintiff is a charitable and educational corporation, organized under special acts of the Legislature of Missouri. As such educational institution it is exempt from liability for employment taxes under Subchapter A of Chapter IX of the Internal Revenue Code, 26 U.S.C.A. Int.Rev.Code, § 1400 et seq. (which does not include employment by carriers). The operations of the plaintiff which constitute the basis of the contention of the parties to this case concern what is known as Cupples Block. Cupples Block, consisting of the equivalent of four or five city blocks, is improved with a number of large industrial and commercial buildings, occupied by tenants of the plaintiff. The property constitutes a part of plaintiff's endowment. Cupples Station was erected in 1890 to provide centrally located freight station facilities for railroads operating in the St. Louis area. In 1900 the Cupples Block was conveyed to the plaintiff. Prior to August 1, 1935, the Terminal Railroad operated Cupples Station. Plaintiff and the Terminal Railroad Association entered into a contract [1] on August 1, 1935, under which

---

[1] Pertinent parts of the contract are as follows:

"First: The University being the present owner of the facilities hereinafter

Cupples Station was operated during the period involved in this case by plaintiff. The Terminal acted on behalf of certain carriers referred to in the contract. All parties agree that Cupples Station was a public freight station prior to the execution of the contract of August 1, 1935.

On execution of the contract, the plaintiff took over the employees of the Terminal Railroad at Cupples Station and, as far as physical operations were concerned, there was no change in the operation of Cupples Station subsequent to the execution of the contract, as compared with its operation

set forth, and as outlined in red on the plat, marked Exhibit A, attached hereto and made a part hereof, together with the improvements thereon, which facilities are commonly known and designated as 'Cupples Station,' hereinafter called Station, and used for the purpose of a freight station at St. Louis, Missouri, will take over and assume the full operation of said Station as an unloading and loading place for less-than-carload freight consigned to or from Station by each of the herein designated Carriers, as well as for loading and unloading carload freight for shippers and consignees.

\* \* \* \* \* \*

"Third: The University will furnish and maintain for the benefit of Carriers all of the equipment and facilities of the character now used at the Station aforesaid, together with railroad tracks, now owned and installed by it, light, heat, power, supplies and other essential appurtenances; also the forces to perform such functions and clerical services as are usual and customary in a railroad freight station for the handling of, and the University hereby covenants and agrees to handle for the Carriers, less than carload freight delivered by, or intended for delivery to, the Carriers at the Station, and will unload and load carload freight for the shippers and consignees on such terms as it may see fit to impose, but without any charge whatever to the Carriers for the loading and unloading of carload freight consigned to or from said Station.

"Fourth: The Terminal shall act as the impartial financial agent or clearing house for the University and the Carriers, in collecting and paying monies due the University and determined as hereinafter expressed.

"Fifth: The Terminal, acting as aforesaid, will pay to the University

"(a) within thirty days from the date hereof, the sum of Fifteen Thousand Dollars ($15,000.00), same being the agreed consideration for the use by Carriers of the aforesaid equipment and facilities for and in the loading and unloading of less-than-carload freight during the period August 1st, 1934, to July 31, 1935, inclusive;

"(b) for furnishing the equipment and facilities and for loading and unloading

less-than-carload freight as set forth in paragraph Third hereof;

"(b-1) rental for the aforesaid equipment and facilities at the rate of One Thousand Two Hundred and Fifty Dollars ($1250.00) per month; and

"(b-2) for the service of loading and unloading, during each month of term hereof, of all less-than-carload freight, at the Station, at the rate of sixty and one-half cents ($0.605) per ton of such freight. The said rate shall remain in force and effect for a period of not less than one year from the date hereof, after which it may be changed by mutual agreement of the University and the Terminal, any such mutually agreed change to be determined after a test made by the duly authorized representatives of the University and the Terminal of the cost and expense to the University, per ton, of such freight, of performing such loading and unloading service during a period of one week to be selected by said representatives for such purpose. Whatever rate may be agreed upon shall remain in effect for not less than one year before being changed in the manner hereinabove provided for the determination of such rate.

\* \* \* \* \* \*

"Seventh: With respect to any Carrier designated herein, University shall be deemed in possession of all less-than-carload freight:

"(a) If delivered at Station by truck, from time unloaded from delivering truck on the platform of Station (a-1) until delivered to consignee in University's premises in the Station, or (a-2) until tendered Carrier, loaded in freight cars placed at Station platform for such loading and tender, or (a-3) if intended for handling from Station by truck, until tendered by University at a place in Station convenient for loading on truck, to the truckman authorized to remove the same from Station and the delivery to University, by such truckman, of receipt for such freight, on form approved by the Carrier;

"(b) from time tendered University by any Consignor who shall be a tenant of University in the premises in the Station, (b-1) until tendered by University to the Carrier entitled thereto, loaded in freight cars placed at Station platform for such loading and tender, or,

prior thereto. The contract of August 1, 1935, provides that the Terminal will pay the plaintiff a rental of $1250 per month, and in addition the sum of 60½¢ per ton for handling less than carload freight at Cupples Station.

The Commissioner of Internal Revenue, in a ruling made on the 22d of July, 1940 [2] held that with respect to the operation of Cupples Station, the plaintiff was an employer, liable for employment taxes under Subchapter B of Chapter IX of the Internal Revenue Code, which covers taxes to be paid by carriers with respect to their employees. Plaintiff paid employers' taxes for five quarterly periods covered by the complaint, and also delivered to the Collector of Internal Revenue the amounts deducted from the compensation of employees, as provided in the Act. Plaintiff filed a claim for refund of employer's and employees' taxes on January 19, 1942. The claim was disallowed by the Commissioner on May 11, 1942, and this suit followed.

Certain employees of Cupples Station during its operation by plaintiff, who are also members of the Brotherhood of Railway and Steamship Clerks, Freight Handlers, Express and Station Employees, were permitted to intervene in this case as parties defendant because of their interest in seniority rights and retirement benefits, indirectly involved. Plaintiff now concedes it is not entitled to recovery under Count Two of the complaint, because of its failure to comply with the provisions of the law and regulations of the Secretary of the Treasury with respect to claim for refund of employees' taxes.

By agreement of the parties, the record in this case includes evidence taken at a hearing on August 26, 1942, before an Examiner of the United States Railroad Retirement Board, together with exhibits introduced at that hearing, the same question being at issue in that suit as is now presented to the Court.

Defendant bases its right to collect the tax in issue on the provisions of the Internal Revenue Code, Section 1532, 26 U. S.C.A. Int.Rev.Code, § 1532 (included in Subchapter B of Chapter IX) and Part I, Section 1(3) (a) of the Interstate Commerce Act, 49 U.S.C.A. § 1(3) (a). Employer is defined in Section 1532, Internal Revenue Code, as follows:

"Definitions

"As used in this subchapter—

"(a) Employer. The term 'employer' means any carrier (as defined in subsection (h) of this section), and any company which is directly or indirectly owned or controlled by one or more such carriers or under common control therewith, and which operates any equipment or facility or performs any service (except trucking service, casual service, and casual operation of equipment of facilities) in connection with the transportation of passengers or property by railroad, or the receipt, delivery, elevation, transfer in transit, re-

(b–2) if such freight be intended for handling from Station by truck, until tendered by University, at a place in Station convenient for loading on truck, to the truckman authorized to remove the same from Station and the delivery to University by such truckman, of receipt for such freight, on form approved by the Carrier;

"(c) if delivered at Station in freight car; from time the car containing such freight shall be set at Station for unloading until (c–1) delivered to consignee in University premises containing Station, or (c–2) if intended for handling from Station by truck, until tendered by University, at a place in Station convenient for loading on truck, to the truckman authorized to remove the same from Station and the delivery to University, by such truckman, of a receipt for such freight in form approved by the Carrier.

"Eighth: The University agrees that it will indemnify and save harmless the Carriers and the Terminal from and against any and all liabilities, judgments, outlays and expenses consequent on (a) any loss of or damage to any and all such freight while in University's possession and (b) injury to or death of any person caused by any act or omission of the University, its agents, employes, or servants, arising in the course of the performance by the University of the services or duties undertaken hereunder. University agrees that it will provide and keep in force and effect during the life of this agreement, at the cost of the University, such policy or policies of liability insurance as will cover, and be adequate to cover and protect against, any liability of the University to its employes and servants, or their representatives engaged in said service, for personal injury or death."

[2] Based on the ruling of the Supreme Court in Union Stock Yards Co. v. United States, 308 U.S. 213, 60 S.Ct. 193, 84 L.Ed. 198, on December 4, 1939.

frigeration or icing, storage, or handling of property transported by railroad, * * *"

"(h) Carrier. The term 'carrier' means an express company, sleeping-car company, or carrier by railroad, subject to part I of the Interstate Commerce Act."

Section 1 (3) (a) of the Interstate Commerce Act, 49 U.S.C.A. § 1 (3) (a) defines the term "railroad" as follows: "The term 'railroad' as used in this part shall include all bridges, car floats, lighters, and ferries used by or operated in connection with any railroad, and also all the road in use by any common carrier operating a railroad, whether owned or operated under a contract, agreement, or lease, and, also all switches, spurs, tracks, terminals, and terminal facilities of every kind used or necessary in the transportation of the persons or property designated herein, including all freight depots, yards, and grounds, used or necessary in the transportation or delivery of any such property. The term 'transportation' as used in this part shall include locomotives, cars, and other vehicles, vessels, and all instrumentalities and facilities of shipment or carriage, irrespective of ownership or of any contract, express or implied, for the use thereof, and all services in connection with the receipt, delivery, elevation, and transfer in transit, ventilation, refrigeration or icing, storage, and handling of property transported. The term 'person' as used in this part includes an individual, firm, copartnership, corporation, company, association, or joint-stock association; and includes a trustee, receiver, assignee, or personal representative thereof."

The position of defendant, that plaintiff in its operation of Cupples Station was an employer within the meaning of the above statute, is based on the ruling in the case of Union Stock Yard Co. v. United States, 308 U.S. 213, 60 S.Ct. 193, 196, 84 L.Ed. 198. We quote the following construction of Section 1(3) (a) from that case:

"The statute, it is true, does not purport to say when one who is a railroad carrier because engaged in furnishing railroad terminal facilities and services, is to be deemed a 'common carrier.' But that question was put at rest in United States v. Brooklyn Eastern District Terminal, 249 U.S. 296, 39 S.Ct. 283, 63 L.Ed. 613, 6 A. L.R. 527. There a local terminal company rendering terminal services as the agent of numerous rail carriers, was held to be engaged in a public or common calling, and hence to be a common carrier within the meaning of the Hours of Service Act, 34 Stat. 1415, 45 U.S.C.A. § 61 et seq., which is applicable to any common carrier by railroad engaged in interstate commerce. Cf. Southern Pacific Terminal Co. v. Interstate Commerce Comm'n, 219 U.S. 498, 31 S.Ct. 279, 55 L.Ed. 310; United States v. California, 297 U.S. 175, 181, 56 S.Ct. 421, 422, 80 L.Ed. 567; United States v. Sioux City Stock Yards Co., C.C.Iowa, 162 F. 556, 39 S.Ct. 286, 63 L.Ed. 613, 6 A.L.R. 527.

"It is not important, as appellant seems to think, that, as an incident to the service it renders to shippers and to the line-haul carriers, it acts as agent of the latter. The character of the service, in its relation to the public, determines whether the calling is a public one, and a common carrier does not cease to be such merely because in rendering service to the public it acts as the agent of another. United States v. Brooklyn Eastern District Terminal, supra, 249 U.S. 307, 39 S.Ct. 286, 63 L.Ed. 613, 6 A. L.R. 527. Connecting common carriers frequently act in that capacity for each other without losing their status as such.

"Nor is it of weight that the terminal service includes no rail-haul. See Southern Pacific Co. v. Interstate Commerce Comm'n, 219 U.S. 498, 31 S.Ct. 279, 55 L. Ed. 310, or that operation and control of the terminal facilities are wholly separate from those of any railroad. United States v. Brooklyn Eastern District Terminal, supra, 249 U.S. 305, 39 S.Ct. 285, 63 L. Ed. 613, 6 A.L.R. 527. It is enough that the loading and unloading are rail transportation services performed at a railroad terminal as a common or public calling by one who, in rendering it, engages in the transportation of property by railroad within the meaning of the Act."

Plaintiff concedes in its brief that the facilities and service furnished for loading and unloading less-than-carload freight at Cupples Station, by it, were facilities and service of railroad transportation as defined by the Interstate Commerce Commission. But plaintiff denies that it is a public freight station or that it performs any activities of common carrier "of a public calling."

Defendant alleges that Cupples Station is a carrier by railroad subject to Part One of the Commerce Act, and points to the fact that the Interstate Commerce Commission on numerous occasions prior to the

execution of the contract between the Terminal and the plaintiff, has held Cupples Station to be a "bona fide railroad station," having "terminal instrumentalities" or "facilities" used in the transportation of property by railroad and in services in connection with the receipt, delivery, transfer, and handling of property transported by railroad. The record supports the claim of defendant that there was no change in the character of the station after plaintiff assumed its operation under the contract of August 1, 1935. The contract refers to the station as "Cupples Station, hereinafter called 'Station' and used for the purposes of a freight station in St. Louis, Missouri." The contract then proceeds to provide that plaintiff "will take over and assume the full operation of said station as an unloading and loading place for less-than-carload freight consigned to or from station by each of the herein designated carriers, as well as for loading and unloading carload freight for shippers and consignees." The contract nowhere restricts or attempts to restrict the operation of Cupples Station for the benefit and use only of tenants of Cupples Block. On the contrary the contract provides, "The University will furnish and maintain for the benefit of carriers all of the equipment and facilities of the character now used at the station aforesaid, together with * * * forces to perform such functions and clerical services as are usual and customary at a railroad freight station for the handling of, and the University hereby covenants and agrees to handle for the carriers less-than-carload freight delivered by or intended for delivery to, the carriers at the station, and will unload and load carload freight for the shippers and consignees * * *."

The "common or public" character of Cupples Station as operated by plaintiff is evidenced by the fact that plaintiff is performing a service which the railroads are bound to furnish as a part of their transportation service in the receipt, delivery, loading and unloading of less-than-carload freight, the charge for such service being included in the line haul rate. Plaintiff's contention that during the period involved in this case no less-than-carload freight was handled for any shipper or consignee other than tenants of Cupples Block is not decisive of this question, in our opinion.

By the contract of plaintiff with the railroads, it undertook to perform such services at Cupples Station "as are usual and customary at a railroad freight station." This contract constituted a holding out to the public of services plaintiff undertook and was ready to perform. That only the tenants of Cupples Block, insofar as less-than-carload freight was concerned, availed themselves of the facilities provided for in the contract, could not change the public character of the service. The tenants of the Cupples Block are a part of the shipping public. Further operation of the Station as a common carrier is shown by the application by plaintiff of the rules covered by the agreement between Cupples Station and the Brotherhood of Railway and Steamship Clerks, Freight Handlers, Express and Station Employees, effective February 1, 1922, in dealing with the employees of Cupples Station. Also, plaintiff received Office of Defense Transportation orders applicable only to "public freight stations" and complied with such orders. Mr. Harry Brookings Wallace, testifying for the plaintiff, as "Chairman of the Board of the Cupples Company," stated that the facilities of Cupples Station were accessible to the public.

Plaintiff attempts to avoid the import of the Union Stockyards Co. case, taking the position, first that "The Interstate Commerce Commission exercises no jurisdiction over the station." In the Union Stockyard Co. case, a like contention was made without avail. Plaintiff further contends that there was no advertising as a public station, nor was anything done to represent the station as one serving the public. It is our opinion that the contract between the Terminal Company and the plaintiff does represent the station as one ready and able to serve the public.

Plaintiff in its operation of the Cupples Station conducts the enterprise as a separate and identifiable entity. The record presented sustains the defendant's position in this respect.

It is our conclusion that the plaintiff, during the period in question was an employer, liable for employment taxes under the Carriers' Taxing Act of 1937, Subchapter B of Chapter IX of the Internal Revenue Code.