**MIDWEST FARMERS, Inc., v. UNITED STATES et al.**

**CROSBY et al. v. SAME.**

**BARTON v. SAME.**

Civ. Nos. 518, 519, 699.

District Court, D. Minnesota, Third Division.

Dec. 27, 1945.

Jerome Hoffmann, of St. Paul, Minn., for Midwest Farmers, Inc..

Harold LeVander (of Kelly & LeVander), of South St. Paul, Minn., for James T. Crosby & Sons and Walter A. Barton.

J. Stephen Doyle, Jr., Sp. Asst. to Atty. Gen., John S. Griffin, Principal Attorney Department of Agriculture, of Washington, D. C., and Victor E. Anderson, U. S. Atty., and John W. Graff, Asst. U. S. Atty., both of St. Paul, Minn., for respondents.

Before SANBORN, Circuit Judge, NORDBYE and BELL, District Judges.

BELL, District Judge.

The United States Department of Agriculture commenced the above entitled proceedings in the Midwest and Crosby cases on May 27, 1942, and in the Barton case on April 7, 1943, by the issuance of an order of inquiry and notice for hearing in each case alleging that the respondents (petitioners here) had violated the provisions of the Packers and Stockyards Act of 1921, as amended, 7 U.S.C.A. § 181 et seq., hereafter called the Act. Oral hearings were held in St. Paul, Minnesota, before an examiner for the Department of Agriculture commencing July 13 and ending September 22, 1943. The Secretary of Agriculture, acting through properly constituted officers, found that the petitioners had violated Sections 303, 304, 307, 312, 401 of the Act, quoted in the margin,[1]

[1] Sec. 303. "After the expiration of thirty days after the Secretary has given public notice that any stockyard is within the definition of Section 302, by posting copies of such notice in the stockyard, no person shall carry on the business of a market agency or dealer at such stockyard unless he has registered with the Secretary, under such rules and regulations as the Secretary may prescribe, his name and address, the character of business in which he is engaged, and the kinds of stockyard services, if any, which he furnishes at such stockyard. Whoever violates the provisions of this section shall be liable to a penalty of not more than $500 for each such offense and not more than $25 for each day it continues, which shall accrue to the United States and may be recovered in a civil action brought by the United States."

Sec. 304 "It shall be the duty of every stockyard owner and market agency to furnish upon reasonable request, without discrimination, reasonable stockyard services at such stockyard: * * *"

Sec. 307 "It shall be the duty of every stockyard owner and market agency to establish, observe, and enforce just, reasonable, and nondiscriminatory regulations and practices in respect to the furnishing of stockyard services, and every unjust, unreasonable, or discriminatory regulation or practice is prohibited and declared to be unlawful."

Sec. 312(a) "It shall be unlawful for any stockyard owner, market agency,

and Section 10 of the Federal Trade Commission Act, 15 U.S.C.A. § 50, which, by reference, is made a part of the Packers and Stockyards Act, 7 U.S.C.A. § 222. The Secretary ordered suspension of the petitioners' registrations as market agencies with the Department of Agriculture for one year in the Midwest and Crosby cases and for thirty days in the Barton case under authority of amendments contained in appropriation acts 1924–1938, 1943, 7 U.S.C.A. § 204, quoted in margin.[2] The effective date of the order at the request of the petitioners was suspended to December 8, 1943.

Petitions were filed with this court on November 26, 1943, seeking to review and permanently to enjoin the order of the Secretary; and, on application of the petitioners, the court stayed the effective date of the orders pending a hearing on the merits. The government answered and filed motions for summary judgment. The motions were presented orally on February 27, 1945, to a court of three judges. Elaborate briefs since have been filed. The hearings, records, briefs and findings were separate in the proceedings, but the cases were presented to the court together, and, because of similarity of facts, issues, and contentions, conveniently and properly may be covered in one opinion.

In the Midwest case the government alleged: (1) that an officer and stockholder of petitioner who served as a cattle salesman was paid money, in addition to proper commissions, by speculators and dealers who "planted" livestock with petitioner for sale; (2) that the petitioner gave gratuities to truckers and shippers to procure consignments; (3) that employees of petitioner purchased livestock from consignments to petitioner without revealing the name of such purchaser; (4) that the petitioner in reports of sale to shippers of livestock failed to show the true name of purchasers; (5) that petitioner knowingly sold livestock to a speculator who was not registered under the Act; (6) that petitioner rendered accounts of sale to consignor indicating that free service was being furnished by petitioner when in fact compensation for such service was included in commission charges; (7) that the petitioner issued its check to fictitious persons for the purpose of concealing an improper payment of money.

In the Crosby case the government alleged: (1) that petitioners sold livestock consigned to them for sale on a commission and accounted to consignors prices other than those actually received; (2) that petitioners altered copy of official scale tickets issued by the State of Minnesota

---

or dealer to engage in or use any unfair, unjustly discriminatory, or deceptive practice or device in connection with the receiving, marketing, buying, or selling on a commission basis or otherwise, feeding, watering, holding, delivery, shipment, weighing or handling, in commerce at a stockyard, of livestock."

Sec. 312(b) "Whenever complaint is made to the Secretary by any person, or whenever the Secretary has reason to believe, that any stockyard owner, market agency, or dealer is violating the provisions of subdivision (a), the Secretary after notice and full hearing may make an order that he shall cease and desist from continuing such violation to the extent that the Secretary finds that it does or will exist."

Sec. 401. "Every packer or any live poultry dealer or handler, stockyard owner, market agency, and dealer shall keep such accounts, records, and memoranda as fully and correctly disclose all transactions involved in his business, including the true ownership of such business by stockholding or otherwise. Whenever the Secretary finds that the accounts, records, and memoranda of

any such person do not fully and correctly disclose all transactions involved in his business, the Secretary may prescribe the manner and form in which such accounts, records, and memoranda shall be kept, and thereafter any such person who fails to keep such accounts, records, and memoranda in the manner and form prescribed or approved by the Secretary shall upon conviction be fined not more than $5,000, or imprisoned not more than three years, or both."

[2] Sec. 204. "Hereafter the Secretary may require reasonable bonds from every market agency and dealer, under such rules and regulations as he may prescribe, to secure the performance of their obligations, and whenever, after due notice and hearing, the Secretary finds any registrant is insolvent or has violated any provisions of this chapter he may issue an order suspending such registrant for a reasonable specified period. Such order of suspension shall take effect within not less than five days, unless suspended or modified or set aside by the Secretary or a court of competent jurisdiction."

so as to show prices other than those actually received; (3) that petitioners gave gratuities to truckers and shippers to procure consignments; (4) that petitioners sold calves to Armour & Company under circumstances excluding competitive bidders; (5) that the petitioners issued reports of sale to shippers of livestock without showing thereon the names of the purchaser; (6) that petitioners failed to reveal to shippers purchases of livestock by their employees from consignments to petitioners; (7) that petitioners failed to keep proper books and records disclosing the payments made to brokers and shippers, the purpose of cash withdrawals, the names of purchasers of livestock and the correct prices at which livestock was sold and weighed.

In the Barton case the government alleged: (1) that the petitioner, a cattle salesman for a livestock commission company, in accordance with an agreement between the petitioner and his employer for the purpose of enabling the petitioner to make money at the expense of shippers and at the same time serve the employer as a cattle salesman without salary or at a small salary, sold to himself livestock which had been consigned to his employer for sale on a commission basis, at prices less than the market value and that this practice was followed from January 1, 1936, to January 1, 1940; (2) that petitioner caused such livestock to be weighed to persons who were not the actual purchasers and not to himself, as a result of which the report of such transactions to shippers did not show the name of the actual purchaser; (3) that the petitioner, while registered as a dealer, purported to sell stock to persons who were not the actual purchasers and whose bonds did not cover such transactions.

It was alleged in each case that these acts constituted unfair, discriminatory, and deceptive practices in violation of the Act and the regulations of the Department of Agriculture.

■ A report of the Federal Trade Commission filed July 3, 1918, after an exhaustive investigation, revealed that five packing companies had complete control over the marketing of livestock from the producer to the consumer. Not only did they fix prices to both, but they owned or controlled stockyard companies and facilities such as exchange buildings, banks, loan companies, terminals, switching and weighing equipment and, indeed, all instrumentalities necessary and convenient to the marketing of livestock. They assigned yard pens to and very largely directed the activities of commission men and traders. By the Act Congress sought to eliminate the unfair and monopolistic practices that existed. One of the chief objectives was to stop collusion of packers and market agencies. Undoubtedly, Congress made an effort to provide a market where farmers could sell livestock and where they could obtain actual value as determined by prices established at competitive bidding. Stafford v. Wallace, 258 U.S. 495, 499–503, 42 S.Ct. 397, 66 L.Ed. 735, 23 A.L.R. 229. While the control of the packers in the marketing of livestock transcends all other purposes of the Act, the practices of the associated agencies require regulation as they likewise are effective and important in marketing livestock.

A stockyard is a public service utility the operation of which affects a national industry. It serves the packing companies, the commission companies, speculators, and traders. It serves the producers of livestock in the area as a market place. All interested parties usually are present when sales are made and have an opportunity to act in their own behalf save the producer of livestock who lives in a distant locality and who seldom is present. The producer consigns his livestock to a market agency to represent him as his agent and who is supposed to have no interest except the welfare of his principal. Accordingly the producer places his financial interests in the absolute control of his agent. Consequently, the success of the livestock producing industry of the country in a large measure depends on the business practices of the stockyard agencies that sell livestock of great value. To say that much depends on the integrity and ethics of those engaged in marketing livestock is speaking mildly. Experience long ago taught that and Congress has lodged it in the Department of Agriculture under the Act of 1921, as amended, obviously because a major portion of the great agricultural industry of the country is vitally concerned.

■■ The Secretary under the Act is authorized to make rules and regulations for its enforcement, 7 U.S.C.A. § 203, to make investigations, hold hearings, make

findings, and suspend registration of offenders, 7 U.S.C.A. § 204. When the findings of the Secretary are supported by substantial evidence, the scope of review of the decisions of the Secretary by the courts is limited to determining whether or not such decisions are in accordance with the law. A review by the court under the Act is not a trial de novo but is a review only of questions of law involved in the administrative proceeding. Acker v. United States, 298 U.S. 426, 56 S.Ct. 824, 80 L.Ed. 1257. The findings of the Secretary are final and will not be disturbed by the court if they are in accordance with the law even though, upon a consideration of all the evidence, the court might reach a different conclusion. Tagg Bros. & Moorhead v. United States, 1930, 280 U.S. 420, 442, 50 S.Ct. 220, 74 L.Ed. 524; St. Joseph Stock Yards Co. v. United States, 1936, 298 U.S. 38, 50, 51, 56 S.Ct. 720, 80 L.Ed. 1033; Farmers' Livestock Commission Co. v. United States, D.C.1931, 54 F.2d 375, 377, 378; Swayne & Hoydt, Ltd. v. United States, 1937, 300 U.S. 297, 304, 57 S.Ct. 478, 81 L.Ed. 659; Rochester Telephone Corp. v. United States, 1939, 307 U.S. 125, 145, 146, 59 S.Ct. 754, 83 L.Ed. 1147; Board of Trade of Kansas City v. United States, 1942, 314 U.S. 534, 62 S.Ct. 366, 86 L.Ed. 432; Interstate Commerce Commission v. City of Jersey City, 1944, 322 U.S. 503, 513, 64 S.Ct. 1129, 88 L.Ed. 1420.

Whether the findings are supported by substantial evidence is a question of law and not of fact and could be presented by a motion for a summary judgment under Rule 56 Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c. Wawa Dairy Farms v. Wickard, D.C. 56 F.Supp. 67; see also Queensboro Farms Products v. Wickard, 2 Cir., 137 F.2d 969; New York State Guernsey Breeders' Cooperative v. Wickard, 2 Cir., 141 F.2d 805; Steuart & Bros. v. Bowles, 322 U.S. 398, 402, 64 S.Ct. 1097, 88 L.Ed. 1350. Complete records of the proceedings before the Secretary, inclusive of a transcript of the evidence in each case were presented to the court, consequently, the court has precisely the same records before it that it would have had if the cases had been tried on the merits. In either case, the determination must be made from the administrative record filed with the court. Acker v. United States, supra.

The issues presented by the motions for a summary judgment are: (1) were the administrative proceedings so conducted as to meet the demands of due process; (2) were the findings and conclusions of the Secretary supported by substantial evidence; and (3) were the orders of the Secretary suspending petitioners' registrations as market agencies in accordance with the law.

The petitioners are contending that they have been denied a fair and complete hearing. In the Midwest case the notice of hearing was filed on May 27 and the answer on June 26, 1942; the hearing was set for July 13 and continued to August 29; the oral hearing was commenced August 31 and concluded September 10, 1942. In the Crosby case the notice of hearing was filed on May 27 and the answer on June 20, 1942; the hearing was commenced July 13, and was concluded on August 12, 1942. In the Barton case notice of hearing was filed on April 7, 1943; answer was made in due time; the petitioner had three months notice of the charges and a month's notice of the date of hearing; the hearing was commenced on September 15, and concluded on September 31, 1943. The hearings were at St. Paul where the petitioners are engaged in business and the three proceedings covered a period of more than two months. The transcripts of the evidence cover approximately 3700 pages. There were about three hundred exhibits. All parties were represented by counsel. The petitioners were afforded an opportunity to present evidence and to cross-examine witnesses for the government. Oral arguments were made and time was allowed for preparation of briefs and requests for findings of fact and conclusions of law. Indeed, much latitude was accorded the petitioners and their counsel to present their respective cases fully and in great detail. A careful examination of the record leads to the conclusion that the hearings in all respects meet the requirements of due process.

The petitioners sought to prove that the alleged wrongful practices with which they are charged were followed by other market agencies. The examiner rejected this evidence and was sustained by the Secretary. It is contended that the rejection of this evidence was a denial of due process. The simple answer is that evidence of misconduct of other agencies

did not tend to prove or disprove the guilt or innocence of the petitioners and was not competent for any purpose. Possibly other agencies were equally guilty with the petitioners but that is no excuse. The petitioners only were on trial. An unfair practice does not become innocuous merely because others indulged in it. Federal Trade Commission v. R. F. Keppel & Bro., 291 U.S. 304, 313, 54 S.Ct. 423, 78 L.Ed. 814; Federal Trade Commission v. Algoma Lumber Co., 291 U.S. 67, 54 S.Ct. 315, 78 L.Ed. 655; Federal Trade Commission v. Winsted Company, 258 U.S. 483, 42 S.Ct. 384, 66 L.Ed. 729; Chapman v. United States, 8 Cir., 139 F.2d 327; Union Stockyards & Transit Co. v. United States, 308 U.S. 213, 222, 60 S.Ct. 193, 84 L.Ed. 198. The petitioners must extricate themselves by purging their business methods of unfair, unjustly discriminatory and deceptive acts, and not by relying on the conduct or misconduct of others who may be equally guilty and who may find themselves in a similar predicament to that of the petitioners. No element essential to due process is absent in the proceeding because of the rejection of this evidence.

To ascertain whether the findings are supported by substantial evidence a careful examination of the record in each proceeding has been made. It is unnecessary to relate in detail the evidence; to do so would unduly prolong this opinion. It is sufficient merely to say that the findings and conclusions of the Secretary in the Midwest and Crosby cases are amply justified by the evidence. We have no criticism of the findings of fact of the Secretary in the Barton case, but, for reasons hereinafter stated, we think that the order of suspension in that case cannot be sustained.

It is appropriate to direct attention to the evidence in the Midwest and Crosby cases relating to certain of the more serious violations shown by the evidence:

(a) In the Midwest case it was proved that Max Alberts was an officer and a stockholder of the petitioner, a corporation. He was its cattle salesman and sold cattle that had been consigned to the petitioner for sale on an open, competitive market on condition that the purchaser as a part of the same transaction buy cattle that had been "planted" with him for sale at more than their market value. This practice resulted in cheating the consignor of cattle that were sold below market prices and an unfair profit to Alberts and his associates on the cattle that had been planted. This conduct covered a period of many years and was known to the petitioner. The evidence further shows that one Dave Malm compensated Alberts on several occasions for his part in such transactions by placing money in an envelope and leaving it at a designated place where Alberts received it. This was admitted by Alberts in statements to others, He did not testify. The petitioner undertook to purge itself of misconduct by discharging Alberts as an officer of the corporation and as an employee. This action was creditable. Alberts, however, retained his interest as a stockholder in the corporation. Moreover, other unfair and deceptive practices were admitted or were uncontroverted. This petitioner had been given fair warning to discontinue certain objectionable practices by a cease and desist order issued on March 2, 1933. Counsel for petitioner in his argument before the Secretary stated:

"We stand here, Mr. Secretary, or I stand here on behalf of this respondent, making no claim that this respondent has not failed to comply, strictly speaking, with some of the rules and regulations. That, as the result of this hearing was completely demonstrated, so much so that were I today to do anything else I should appear ridiculous. It is our sincere contention, however, sir, that the violations that we have indulged and that have been established by means of these hearings and are contained in this record are of such a nature that in themselves they do not justify the proposed order of the examiner. * * *

"It is claimed here as part of the order and part of the basis for the proposed order of the examiner that this respondent failed to keep proper records of its transactions. That cannot be denied, Mr. Secretary * * *."

In connection with the conduct of Alberts, counsel for petitioner at the hearing before the Secretary stated:

"Here's a man, Max Alberts, * * * who for some reason or * * * because of the failure to exercise reason, has indulged the doing of something that is reprehensible to everybody familiar with him.

"There is no condoning of it. There is no excusing of it.

"The respondent did not insult the intelligence of the Examiner nor the Solicitor and does not now propose to insult the Secretary's intelligence by attempting to explain it away. There it stands like the writing in chalk on the board behind the Secretary. There it is, the horrible record made by this individual. * * *

"I have purposely left to this time two charges directed against the respondent by the Government that are very serious, Mr. Secretary, and to me and to the respondent most regrettable. * * *"

(b) In the Crosby case, the evidence shows that the petitioners gave or offered gratuities to truckers Elliott, Quast, Gisslason, Westbrock, Bergner, Hamilton and others. Gratuities were offered to truckers Bruns, Dorwin, and Riley but were refused by them. In 1940 Thomas R. Crosby, a member of the firm, withdrew in cash $1480 for "soliciting expense" and in addition $1821 for which no explanation was made. His salary for the year was $8000. As of December 31, 1940, he had withdrawn from petitioner's funds without record or explanation a total of $17,-855. These gratuities were to secure deliveries of livestock by paying truckers for such favors. They were in small payments but aggregate a substantial sum.

Petitioners' methods in the sale of calves are subject to criticism, and it is a fair inference that they were not conducive to the maintenance of an open and competitive market. It appears from the evidence that petitioners sold to Armour & Co. 99.23 per cent of all veal calves consigned to them in 1940 and 98.81 per cent in 1941. A comparable situation as to percentage of veal calves sold to Armour likewise prevailed for many years prior to the years referred to. Furthermore, it appears that the buyer for Armour sometimes bought calves by telephone from petitioners without seeing them. Apparently, according to the custom in the market, the first buyer at the alleys of a market agency had the prior right to bid. The buyer of Armour & Co. usually was present at petitioners' alleys when the market opened at 8 a.m., and made his bid for the calves on hand to the exclusion of other buyers, which in effect and under the practice gave Armour & Co. precedence, unless its bid was rejected. It is to be gathered that the Armour buyer was always at the alleys of petitioners promptly at eight o'clock in the morning, except on Saturdays, and no other bidder seemed to contest his right to preempt petitioners' alleys. Perhaps other bidders assumed that there was some understanding between Armour and petitioners as to the former's right to have the first bid. Although the evidence would not support a finding that the calves were sold to Armour for a price less than the going market price, the custom or practice or understanding of excluding or dissuading other bidders, or of not inviting bids from competitors, tended to prevent the consignors from having the opportunity to sell their shipments through petitioners' agency under conditions where free competition prevailed. Certainly, competitive bids are usually conducive to a higher price for the cattle which is to be sold. Under the Act, a market agency is supposed to render reasonable stockyard services which, as required by Section 304 of the Act, are not furnished under the circumstances referred to. Although this practice of dulling competition is to be condemned as being contrary to the intent and spirit of the Act, it is doubtful that a suspension based on such circumstances, standing alone, and without any showing of actual injury to consignors, would be justified. A cease and desist order might more properly be invoked, but in conjunction with the other violations referred to, the practice complained of does tend to support the Secretary in his decision to issue the suspension order.

The petitioners failed to show the true name of purchasers as shown by the account of sales on October 29, 1940, in the Kalinoski and in the Ordal and Currie transactions in which James W. Crosby himself was the purchaser; also in the Wittry transaction on July 19, 1940, and in the sales to Kaye, an employee of the petitioners, in thirteen different transactions in July and August 1940. Sales were made to unregistered dealers. Accounting was made of prices other than those entered on the scale tickets as shown by sales of hogs to Swift & Co. July 1 to 29, 1940. Alterations in prices were made on scale tickets for the sale of hogs in five transactions on September 8 and 9, 1941, where prices were written up or down. This practice was for the purpose of not divulging information of the prices at which the hogs were actually sold. Such transactions were known in the market as "sales under the hat".

(c) In the Barton case, the petitioner, Walter A. Barton, was, at the time of the institution of these proceedings, registered and transacting business as a market agency under the name of Barton Commission Company. This registration took place in 1940. All of the violations which form the basis for the order of suspension occurred between the years 1936 and 1940, before Barton was registered as a market agency and when he was employed by the Seekins Commission Company as a livestock salesman. It appears that he was first registered as an individual doing business as a dealer under the name of Walter Barton on April 19, 1922. Registration under the Act is effected by filling out a prescribed form and sending it to the Secretary and giving and maintaining a bond in such amount as may be required by the Secretary. Barton was not a registered bonded dealer between 1926 and 1931. On January 29, 1931, he filed notice with the Secretary that he was again doing business as a dealer under the trade name of the Capitol Cattle Company. On April 19, 1935, he filed notice that he had discontinued doing business under that name. On April 22, 1935, he filed notice that he was doing business as a dealer under the name of Union Cattle Company. He sold the Union Cattle Company on January 21, 1937, and his registration as a bonded dealer under that name terminated as of that date. The respondents assumed to term Barton's status as inactive after January 21, 1937, but clearly that designation begs the question. He was either a registered dealer, or he was not registered. When he sold the Union Cattle Company in 1937 and so notified the Secretary and thereafter no longer maintained his bond, it seems clear that, under the Act, he was considered as an unregistered dealer. If he assumed to function as a dealer under such circumstances he would be amenable to the penalties which the Act prescribes when a person assumes to act as a dealer without being registered.

As stated, Barton for the first time registered as a market agency on January 2, 1940. A market agency under the Act is not the same as a dealer. The classifications are distinct. A market agency means "any person engaged in the business of buying or selling in commerce livestock at a stockyard on a commission basis." A dealer means "any person, not a market agency, engaged in the business of buying or selling in commerce livestock at a stockyard, either on his own account or as the employee or agent of the vendor or purchaser." It is conceded that, during the period from 1936 to 1940, while employed as a livestock salesman for the Seekins Commission Company, petitioner bought cattle from consignments to this employer; that is, he acted as a salesman for Seekins and then sold the cattle to himself. Apparently he made a profit on such transactions from June 27, 1936, to November 23, 1939, of something over $20,000. The record shows no losses or charges for stock feeding. That he made substantial profits on the resales to himself is evident. Furthermore, it appears that, at the inception of petitioner's employment with Seekins, they agreed that the petitioner might buy on his own account cattle from those consigned to Seekins, and as compensation for this privilege it was agreed that petitioner would act as a salesman for Seekins at a small salary. This agreement, therefore, provided Seekins with a salesman at little cost and enabled petitioner to make a substantial profit. By this arrangement, there is evidence which strongly tends to establish that those who intrusted to Seekins shipments of livestock for sale were denied an opportunity to obtain the higher prices which might be afforded on an open and competitive market, and with a probable loss to the consignors. There is no showing or contention that there ever was any report or disclosure to the shippers that their cattle were sold to petitioner or to anyone connected with Seekins. The cattle thus purchased by Barton were weighed to concerns other than Walter Barton or Union Cattle Company, the trade name of Barton during the year 1936. That Barton and his employer, Seekins, were subject to discipline under the provisions of the Act seems clear. Their acts were in patent violation of Section 312(a), which provides: "It shall be unlawful for any stockyard owner, market agency, or dealer to engage in or use any unfair, unjustly discriminatory, or deceptive practice or device in connection with the receiving, marketing, buying or selling on a commission basis or otherwise, feeding, watering, holding, delivery, shipment, weighing or handling, in commerce at a stockyard, of livestock."

Certainly, such practice on the part of a market agency is unfair and deceptive, and Barton, either as a registered or unregis-

tered dealer, aided and assisted Seekins, the market agency, in an unfair practice. As stated in the decision upon which the order of the Secretary is based: "Selling cattle to himself without the knowledge of the consignors was contrary to common honesty and fair dealing * * *."

■ The question arises, however, Did the Secretary have the authority to take the particular disciplinary action which is now under consideration? A somewhat detailed consideration of the authority vested in the Secretary seems necessary. Barton was not, we think, a registered dealer between January, 1937, and January 2, 1940. Certainly he was not operating nor authorized to operate as such. Most of the purchases of cattle consigned to Seekins took place during that period, though it is fair to assume from the evidence that some of the purchases may have taken place during the year 1936 when Barton was registered as a dealer under the trade name of Union Cattle Company. It does not appear, however, that any of the transactions were carried on in the name of Union Cattle Company, and Barton evidently did not operate under that trade name during the year 1936 when he was purchasing cattle from Seekins. Section 303 of the Act provides that "no person shall carry on the business of a market agency or dealer at such stockyard unless he has registered with the Secretary under such rules and regulations as the Secretary may prescribe * * *." The Act further provides that whoever violates this provision "shall be liable to a penalty of not more than $500 for each such offense and not more than $25 for each day it continues, which shall accrue to the United States and may be recovered in a civil action brought by the United States." Presumably, a cease and desist order could also be obtained where one assumes to act as a dealer and thus violates the provisions of the Act. But the Secretary's power to suspend a registrant is limited to the authority granted in the amendment contained in the Appropriation Acts. This amendment authorizes the Secretary to require reasonable bonds from every market agency and dealer to secure the performance of their obligations and if, after due notice and hearing, a *registrant* is insolvent or has violated any of the provisions of the law governing such market agency or dealers, the Secretary "may issue an order suspending such *registrant*

for a reasonable specified period." (Italics supplied.) Manifestly, if one is not a registrant, he cannot be suspended. The amendment sought to clothe the Secretary with additional jurisdiction over registrants, not as to persons who might be acting as dealers or as a market agency without being registered in conformity with the Act. Such persons are subject to severe civil penalties under the main provisions of the Act if they assume to act in such capacities without being registered. It seems reasonable to conclude, therefore, that if Barton had never been registered after 1937, the Secretary would have no jurisdiction to enter an order of suspension, and for whatever acts of commission or omission were committed by him in violation of the Act, the Secretary would be relegated to the enforcement of such civil penalties as the Act provides. However, the Secretary, after Barton had ceased to operate as a registered dealer for some three years, accepted his registration as a market agency in 1940, and this proceeding was instituted some three years thereafter. Barton had never been registered as a market agency before. It is not contended that he has in any way violated the Act since his registration as a market agency. His record as such operator in the South St. Paul stockyards is without criticism herein. A fair consideration of the amendment authorizing the Secretary to suspend strongly suggests that the right to suspend depends upon acts in violation of the Act which were committed when the dealer or market agency was registered as such and during the time when such registration was in force. Assume that Barton had never been registered under the Act and had associated himself as agent or employee of a registrant and thus had aided such registrant in violation of the Act, and assume further that some years thereafter he was registered by the Secretary as a dealer or market agency, and in reliance on said registration at a very considerable expense built up an extensive business. Could it be successfully contended that, under these circumstances, the Secretary could suspend the registration which he granted, because of acts committed some years before when the registrant was not registered? Respondents seem to labor the contention that, if Barton's registration as a market agency is denied, the Secretary is helpless to punish Barton for the wrongs which were

committed by him in the past. Obviously, the other remedies available to the Secretary under the Act remain in the event the Secretary desires to utilize them. We merely hold that the particular remedy of suspension must be limited to an order revoking a registrant's right to operate as "such registrant" for violations of the Act committed while the registration sought to be suspended was in force. Whether the Secretary might have refused Barton the right to register as a market agency because of prior misconduct or bad character is not before us. Having accepted his registration as a market agency and it appearing that Barton never before was registered under that classification, his suspension as a market agency can only be justified by giving a forced and strained construction to the amendment to the Appropriation Act.

The jurisdiction of the Secretary to suspend the petitioners' registrations was challenged by motions to dismiss before the Secretary and later the court on two grounds: (a) the power of the Secretary to suspend market agencies is a general provision applicable to the Act as a whole and, therefore, is not applicable to the sections of the Act where specific provision for disciplinary action is given; and (b) that the suspension period imposed by the Secretary is not for a "reasonable specified period."

(a) Section 312(b) authorizes the Secretary to make a "cease and desist" order for a violation of Section 312(a). Section 314 provides for the forfeiture of $500 for each offense in violation of Sections 310, 311, and 312 of the Act recoverable in a suit in the name of the United States. Section 401 imposes a penalty on a market agency or dealer for failure to keep accounts, records and memoranda as prescribed by the Secretary. Section 205(3) imposes a penalty for violation of Section 204 after an order of the Secretary thereunder has been sustained by the courts. Congress added a rider to the appropriation act for the Department of Agriculture each year from 1924 to 1938 inclusive authorizing the Secretary to suspend registrants "for a reasonable specified period" for violation of the Packers and Stockyards Act. Congress on July 12, 1943, in the enactment of the provision made it permanent by the insertion of the word "hereafter" so as to make it read: "Hereafter the Secretary may * * * issue an order suspending such registrant for a reasonable specified period * * *." 57 Stat. 422, 7 U.S.C.A. § 204.

Petitioners contend that the authority to suspend market agencies is a general provision applicable to the Act as a whole and, therefore, is not applicable to the sections of the Act where specific provision for disciplinary action is provided, and they seek to apply the doctrine of ejusdem generis. This doctrine may be invoked where there is ambiguity, to aid in construction; but, it is elementary that where no ambiguity exits, no question of construction is presented and there is no occasion to apply the doctrine. United States v. Gilliland, 312 U.S. 86, 61 S.Ct. 518, 85 L.Ed. 598; United States v. Missouri Pacific Railroad Company, 278 U.S. 269, 49 S.Ct. 133, 73 L.Ed. 322. As we read the provisions of the Act, inclusive of the power to suspend, they are clear and unambiguous and there is no occasion to resort to rules of any kind in aid of construction. Congress in the appropriation acts merely added cumulative power for use against offenders of the act. Obviously it was intended to confer on the Secretary the power to suspend market agencies for violations of any section of the Act so he might undertake to eliminate unfair practices when theretofore he could issue only cease and desist orders. The additional proviso is not inconsistent with the other provisions; neither does it alter, modify, or invalidate any of the provisions of the Act; it and all the provisions may be harmonized and given full force and effect. Consequently, the plain meaning is that the Secretary has the power to suspend the registration of a market agency for any violation of the Act.

(b) Petitioners contend that suspension for one year is not a "reasonable specified period" as provided by the Act. There can be no judicial interference with the exercise of administrative discretion, either in the conduct of the proceedings or in the officer's conclusions, provided they are supported by substantial evidence. Public Service Commission v. Havemeyer, 296 U.S. 506, 56 S.Ct. 360, 80 L.Ed. 357; Virginian Railway v. United States, 272 U.S. 658, 47 S.Ct. 222, 71 L.Ed. 463; Farmers' Livestock Commission Company v. United States, D.C., 54 F.2d 375. The court in these cases has no discretion or control over the period of suspension so

long as the order of suspension was not so unsupported by the evidence as to be arbitrary and capricious and that is not the situation here. The suspensions in the Midwest and Crosby cases were in accordance with the law.

Petitioners contend that it was no offense to sell livestock to themselves or to their employees provided the facts pertaining to the transaction promptly were disclosed to the owner or consignor of such livestock. See Rule 12, General Rules and Regulations of the Secretary of Agriculture with respect to Stockyard Owners, Market Agencies, Dealers, and Licensees. Of course, petitioners should not be punished or disciplined for something that was not a violation of the law or the rules and regulations. However, the Secretary not only found that such sales were made but also that the facts were not disclosed. According to the records it is a fair assumption that the suspension orders of the Secretary were based on conclusions that the facts were not disclosed (plus other violations) and not on findings that sales were made to the petitioners themselves or their employees. It would seem more in accordance with well established legal principles and business ethics to deny absolutely the right of a market agency or its employees to purchase livestock from its consignors under any circumstances.

The methods of transacting business in the yards constantly are a temptation to collusion. Sales of livestock are made by negotiation and bargaining, and not at public auction. The purchaser is present; the shipper is not, but relies on his market agency. The agent is in closest contact with buyers for packers, with speculators and traders and perhaps has dealt with these same persons for many years; so, in accordance with human instincts, ways and means are found to profit at the expense of the absent member to the transaction. A marketing agency should maintain a position at all times which would assure absolute loyalty to its shippers. No interest should be allowed to interfere between the agent and his principal. When an agency receives a consignment of livestock, the sole objective should be to sell it at the highest price obtainable on an open, competitive market. When the agency acquires an interest, other than agent, it no longer can honestly and efficiently represent the principal. Of course, one person cannot act as both purchaser and agent any more than one man can serve two masters. The Secretary found that petitioners indulged in conduct that precluded them from giving fair and reasonable stockyard service to shippers. When Alberts took a "plant" of cattle from Malm or any other person for the purpose of forcing a sale at more than their market value by offering in the same transaction a consignment of cattle at less than their value, he acquired an interest and was guilty of sacrificing the property of his consignor. When he accepted money for his part in such transactions, it was not compensation for a market agency service but was to share in the proceeds of wrongful and illegal transactions.

When petitioners (in the Midwest and Crosby cases), in order to obtain consignments, gave gratuities to truckers, whether in the form of meals, drinks, entertainment or cash, they were engaged in an unfair practice in violation of Section 312 (a). Failure of these petitioners to keep records that clearly disclosed all transactions involved in their business was a violation of Section 401, and failure to report sales fully and accurately to consignors was a violation of Section 307 of the Act. Alteration in scale tickets, manipulation of records, failure to show the name of the purchaser, sales to employees and fictitious persons and other acts designed to cover the true and actual facts were violations of the law and the rules and regulations of the Department of Agriculture. The violations of the petitioners as found by the Secretary were precisely the practices that Congress sought to prevent.

As heretofore indicated, the question whether or not the disciplinary action taken by the Secretary in these cases is unduly severe is not a question with which this court properly can concern itself. However, it may not be amiss to point out that the practices which form the basis for the suspension apparently have been corrected and abated since the orders under review were entered. Some three years have elapsed since the proceedings were instituted and two years have elapsed since the orders of suspension were entered. During that period, petitioners have remained in business and presumably have conformed with the law and the regulations. Some of the practices herein condemned had undoubtedly been followed by other market agencies in this particular

market, as well as by these petitioners, and the gravity of such violations was not in all instances brought home to those operating on the market, until the institution of these proceedings. It is fair to assume that the publicity attendant upon the orders of the Secretary have had a salutary effect on the entire situation at this particular market. A suspension for any substantial period of time is probably tantamount to an order which permanently closes the market agency's business. It is a serious thing to deprive any man of his means of earning a livelihood. In light of these circumstances, we take the liberty of suggesting that it may be appropriate for the Secretary to consider whether it is necessary in the public interest that the remedy prescribed by the orders should now be enforced.

The motion for a summary judgment in each case, except that of Barton, is sustained and judgment as prayed for in the separate motions, except in that case, may be entered accordingly. The motion for judgment in the Barton case is denied and the order in that case is reversed. It is so ordered.