(No. 16356.—Judgment affirmed.)

The Chicago and Eastern Illinois Railway Company, Appellant, *vs.* The Chicago Heights Terminal Transfer Railroad Company, Appellee.

*Opinion filed April 24, 1925.*

1. Carriers—*definition of a common carrier.* A common carrier is one who undertakes for hire to transport from place to place such persons, or the goods of such, as choose to employ it.

2. Railroads—*railroad company is a common carrier.* A railroad corporation exercising all its franchises is a common carrier, and the fact that its facilities are limited so as to enable it to serve only a few customers, or even a single customer, does not change the character of the corporation.

3. Same—*terminal railroad company must file tariff of rates—contracts.* A terminal railway company handling interstate traffic is a common carrier subject to the provisions of the Interstate Commerce act in regard to the filing of tariffs of rates for service rendered, and such company has no power to contract with any person or railroad for a different compensation than published in its tariff.

4. Same—*railroad companies cannot claim freedom of contract as to rates.* Constitutional provisions regarding the freedom of contract and inviolability of contract do not apply to contracts by common carriers, where the same are affected by the regulations of the Interstate Commerce Commission under the Interstate Commerce act.

Appeal from the Second Division of the Appellate Court for the First District;—heard in that court on appeal from the Superior Court of Cook county; the Hon. Denis E. Sullivan, Judge, presiding.

Homer T. Dick, and Gallagher, Kohlsaat, Rinaker & Wilkinson, for appellant.

Butler, Lamb, Foster & Pope, Ryan, Condon & Livingston, and Walter, Burchmore, Collin & Belknap, (William E. Lamb, James G. Condon, Luther M. Walter, Allen J. Carter, and David J. Greenberg, of counsel,) for appellee.

317—5

Mr. Justice Stone delivered the opinion of the court:

Appellant, the Chicago and Eastern Illinois Railway Company, (hereinafter referred to as the railway company,) filed its bill against the Chicago Heights Terminal Transfer Railroad Company, (hereinafter referred to as the terminal company,) seeking an injunction against the violation of a certain contract entered into between them and asking for specific performance of the same. Upon a hearing the superior court of Cook county dismissed the bill for want of equity. Its decree was affirmed by the Appellate Court, and the cause comes here on a certificate of importance issued by that court.

The facts are not in dispute. As to most of them a stipulation has been filed. The railway company was organized in 1920 under the laws of the State of Illinois and succeeded to the rights, franchise and property of the Chicago and Eastern Illinois Railroad Company. The terminal company is also a railroad corporation organized under the laws of this State in 1898, and is and has been operating and managing a railroad at Chicago Heights, consisting of twenty-two miles of track. Its business is to transport in-bound and out-bound freight to and from points on its line in and near the city of Chicago Heights to and from the tracks of four trunk line carriers, including appellant, at that place. Shipments originating on these trunk lines destined to points on the terminal company tracks are placed by the trunk line on a convenient track, and the terminal company by its own engines and crews places the same at the particular point of destination on its tracks. Out-bound shipments are received from the shipper by the terminal company, as are requests from the industries for car placements. The terminal company bills the shipments out over the trunk line railway designated, and transports such shipments over its rails to a track used as an exchange track and there delivers them to the trunk line. Daily re-

ports are made of this business. Out-bound cars from Chicago Heights are sealed by the terminal company, regardless of the road to which they are to be delivered. In-bound and out-bound cars received by the terminal company are first taken to its classification yards some distance from the trunk line tracks. These yards are about a mile and a half from the railway company's tracks. When placed in the classification yards the cars are classified as to the trunk line to which they are to be delivered if out-bound, and as to the industry if in-bound. The evidence shows that the service of this character rendered by the terminal company to the railway company, and the manner of handling the cars connected therewith, are identical with the service rendered and methods used as to the other trunk lines. This service is the same whether the shipment be interstate or intrastate. The record shows that the railway company and the other trunk line railroads are all interstate carriers, and that shipments originating on the terminal company are both interstate and intrastate. Prior to April, 1900, the railway company's predecessor and two other railroad companies used the tracks of the terminal company to move freight to and from points on the latter's line to their own tracks. In so doing they used their own engines and crews and confusion arose over the use of the tracks, and on April 16, 1900, the terminal company took over all control and operation of the tracks and established the character of service hereinabove referred to. This continued until May 14, 1907, when the agreement which is made the basis of this bill was entered into by appellant's predecessor and the terminal company. It may be styled an operating contract. Another agreement or auxiliary contract was at that time executed between the parties for the purpose of arranging a method of payment of back claims of the terminal company against the predecessor of appellant. By this auxiliary contract a grant of a $5.50 Chicago rate was given to the terminal company. As this auxiliary contract is conceded

to be illegal it will not be necessary to refer to it further in this opinion.

The main contract in question provides that it is to run for a period of 99 years. By it the terminal company is to transport all cars between the tracks of the railroad company and the industries on the terminal company's lines, for which service it is to receive a compensation of one dollar per car, and in addition thereto the proportion of the cost of operation and maintenance of the terminal company's road which the number of loaded cars transferred by the terminal company for the railroad company bears to the entire number of loaded cars handled by the terminal company. This service includes interchange of empty cars, with, however, an additional compensation to the terminal company of twenty-five cents for each empty car moved for the railroad company. Within the scope of the cost of operation are to be considered loss or damages paid for personal injuries, injury to property or cars while on industrial tracks, taxes, government charges, etc. The contract provides that in case of disagreement between the parties the subject matter thereof shall be submitted to arbitrators. It also provides that if the services of any official or employee below the rank of general superintendent is unsatisfactory to the railroad company it shall have the right to require the discharge of such employee or officer. Appellant, when organized, took over the contract. Operations under this contract were carried on until July 22, 1922, when the terminal company filed its tariff of rates with the Interstate Commerce Commission and the Illinois Commerce Commission, which it here claims it was required to do under the Interstate Commerce act and the Illinois Public Utilities act. These tariffs were higher than the compensation paid under the railway company's contract and similar contracts which the terminal company had with other trunk lines. The terminal company took the position that the compensation under the contract was en-

tirely inadequate, and declared that the rates in the tariffs filed with the Interstate and Illinois Commerce Commissions must be paid. The record shows that the railway company sought to suspend the tariff by action before the Interstate Commerce Commission and the Illinois Commerce Commission, and failing to secure favorable action by these bodies it filed this bill for specific performance on the ground that the service rendered under the contract between it and the terminal company was that of an agent and not carrier service, and was therefore not subject to the tariff filed or the regulations prescribed by the commissions.

A number of questions have been raised and discussed by counsel in elaborate briefs filed. The question naturally first presenting itself is as to the legality of the contract. The railway company contends that it is merely an agency contract and is not in conflict with the Transportation act, concerning filing of tariff rates and requiring compensation in accordance therewith, while appellee contends that the service rendered is carrier service; that both parties to the cause are engaged in interstate commerce and so are subject to the jurisdiction of the Interstate Commerce Commission as well as the Illinois Commerce Commission; that appellee is bound to publish its tariffs as other carriers are required to do and to charge for its services accordingly, and that the contract in question is wholly illegal and void.

Whether this service is within the purview of the Interstate Commerce and Illinois Public Utilities acts depends in the first instance on whether the parties to the contract are to be here considered as common carriers. It is admitted that appellant is a common carrier, but it contends that as to the service rendered by appellee the latter is not. A common carrier is one who undertakes for hire to transport from place to place such persons, or the goods of such, as choose to employ it. A railway corporation exercising all its franchises is a common carrier. The reason for the existence of the law incorporating railway companies is that they

may carry goods and passengers. Their franchises and property are affected with a public interest. The fact that their facilities are limited so as to enable them to serve only a few customers, or even a single customer, does not change the character of the corporations. Terminal railway companies are held in this State to be common carriers. *Kenna* v. *Calumet, Hammond and Southeastern Railroad Co.* 284 Ill. 301; *Devine* v. *Chicago and Calumet River Railroad Co.* 259 id. 449.

*Sholl Bros.* v. *Peoria and Pekin Union Railway Co.* 276 Ill. 267, is cited by appellant as authority for the contention that the terminal company here is not a common carrier. The railway track in that case was a private switch-track, not owned by a railway company or operated by it as a part of its railroad. This was likewise true in the case of *Koelle* v. *Knecht,* 99 Ill. 396. These cases are not authority for the contention of appellant.

In *United States* v. *Union Stock Yards,* 226 U. S. 286, it was contended, as appellant contends here, that the junction railway there involved was merely the agent of the appellant railway, and that it was not performing a transportation or carriage service but a mere switching service. The court there said: "To call this service a switching service, does not in any respect change its character. Whether the work done be to switch a car a mile or haul it two hundred miles, it is none the less a transportation or carriage of the car and its contents by an independent operator." It was there held that the character of the service, and not the designation of such service, determined whether or not it was an act of transportation or carriage. It was also held that the junction railway was a common carrier. To the same effect is *United States* v. *Brooklyn Eastern District Terminal Railroad Co.* 249 U. S. 296.

In this case the terminal company is engaged in the transportation and carriage of goods for hire. The mere fact that it has a contract in which the manner of rendering

the service and the compensation therefor were specified in nowise changes the character of the service rendered. It was the service of a common carrier, and this being true, the terminal company was subject to all rules and regulations to which common carriers are subject, including the provisions of the Interstate Commerce act. By paragraph 3 of section 1 of that act (24 Stat. at Large, p. 838,) it is provided that wherever the word "carrier" is used in the act it shall mean "common carrier." Transportation under the act is defined to include locomotives, cars and other vehicles and all instrumentalities and facilities for shipment or carriage, irrespective of ownership, or of any contract, either express or implied, for the use thereof, and all service connected with the receipt, delivery and handling of property transported. Paragraph 1 of section 6 of the act provides as follows: "That every common carrier subject to the provisions of this act shall file with the commission created by this act and print and keep open to public inspection schedules showing all the rates, fares, and charges for transportation between different points on its own route and between points on its own route and points on the route of any other carrier by railroad, * * * when a through route and joint rate have been established. * * * If no joint rate over the through route has been established, the several carriers in such through route shall file, print and keep open to public inspection as aforesaid, the separately established rates, fares, and charges applied to the through transportation."

It will be noted that by the paragraph just quoted common carriers may establish a joint rate, which shall be filed with the tariff of rates, and if there be no joint rate agreement entered into or such rate established, each railroad shall file its own separate tariffs. It is not contended here that any attempt has been made to establish a joint rate between the parties to this proceeding. On the other hand, the evidence shows that the only rate published was that

of the railway company, which included in it rates to points of delivery or origin upon the terminal company tracks. There was no such agreement as is required to constitute the establishment of a joint rate, and, moreover, to so contend would be inconsistent with the contention of appellant that this is an agency contract and not a contract for carriage. Paragraph 1 of section 6 imposes upon the common carrier the duty of filing and publishing rate tariffs. Other paragraphs of that section specify the manner of making such tariffs, and it seems clear that it was the duty of appellee to file a tariff, as was done in this case.

, Section 2 of the Interstate Commerce act of 1906 prohibits any carrier, unless otherwise provided, demanding, collecting or receiving a greater, less or different compensation for transportation of persons or property, or for any service in connection therewith, than the rates, fares and charges specified in the tariff filed and in effect at the time. In *Louisville and Nashville Railroad Co.* v. *Mottley,* 219 U. S. 467, this section was construed as prohibiting the railroad company from lawfully issuing to Mottley and his wife a pass. It was there held that an interstate carrier cannot, since the enactment of the Interstate Commerce act, make a valid contract to issue annual passes, and that Congress, in the exercise of its power over commerce, had a right to enact the provisions of said act which rendered unenforceable a prior contract valid when made, by which an interstate carrier agreed to issue annual passes for life in consideration of a release of claim for damages. It was there held that the constitutional provisions regarding the freedom of contract and inviolability of contract do not apply to contracts by common carriers where the same are affected by the regulations of the Interstate Commerce Commission under the Interstate Commerce act.

It seems clear, therefore, that the terminal company had no power to contract with any person or railroad for a different compensation than published in its tariff. While it

is urged that the contract is in form an agency contract, the service called for is the service of a carrier which that carrier may not lawfully give in any manner other than by its published tariff of rates. This contract conflicts with the Interstate Commerce act and is for that reason invalid. Counsel agree that this is the outstanding question in the case. The contract being invalid under the Interstate Commerce act, it does not become necessary to discuss the application of similar requirements of the laws of our own State. Nor is it necessary to consider the numerous other questions raised on the record.

The superior and Appellate Courts did not err in holding this contract void. The judgment of the Appellate Court is therefore affirmed.