# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

September 29, 2011

No. 10-41276
Summary Calendar

Lyle W. Cayce
Clerk

JEFFREY HUNTLEY,

Plaintiff–Appellant,

v.

BAYER MATERIALSCIENCE, L.L.C.,

Defendant–Appellee.

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 3:10-CV-10

Before WIENER, PRADO, and OWEN, Circuit Judges.

PER CURIAM:[*]

Plaintiff Jeffrey Huntley sued his employer, Bayer MaterialScience, L.L.C. (Bayer), under the Federal Employers Liability Act and the Texas Railroad Liability Act for injuries he sustained in the course of his employment on a rail car switch crew. The district court granted summary judgment in Bayer's favor. We affirm.

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 10-41276

**I**

Bayer is a chemical company that manufactures isocyanates and polycarbonate "intermediates" at its Baytown Facility (Facility), an approximately 1,600 acre industrial park. Bayer's site logistics department is responsible for the movement of product and raw materials within the Facility. During the relevant time period, the department's responsibilities included sorting and switching rail cars delivered to the Facility by either Union Pacific Railroad (Union Pacific) or Burlington Northern Santa Fe Railway (BNSF), and distributing those rail cars to the various process units within the Facility. The rail cars were loaded with product, and Bayer switch crews took the cars back to a central point within the Facility (termed the Runaround), from which Union Pacific or BNSF delivered the product throughout the United States.

Within the Facility, which Bayer owns, several unrelated chemical processing companies (Lessees) lease sites where their materials are processed. The Lessees are Bayer suppliers, but also sell at least some materials to other consumers. Pursuant to individual contractual arrangements between Bayer and each Lessee, Bayer performs switching and transportation services for the Lessees within the Facility similar to those conducted with respect to Bayer's own processing units. Specifically, Bayer moves loaded rail cars owned by the Lessees from their respective plants to the Runaround where Union Pacific or BNSF enters the Facility, "couples up" with the rail cars, and takes them to their final destination. When the Lessees' rail cars are delivered to the Runaround by Union Pacific or BNSF, Bayer sorts, switches, and delivers them to the appropriate Lessee. The Lessees compensate Bayer for this service under the terms of the individual contracts. The Lessees have their own contractual arrangements with Union Pacific and BNSF to transport their products in interstate commerce from the Facility.

2

No. 10-41276

In addition to providing these contractual transportation services to the Lessees, on two occasions Bayer also provided limited rail service to its neighbor, electric utility HL&P.  Specifically, Bayer transported equipment to an HL&P power station located adjacent to the Facility by utilizing a Bayer switch engine to move rail cars owned by third parties through Bayer's property and onto HL&P's property.  Bayer did not receive any compensation for these services.

Huntley was employed by Bayer as a site logistics technician on a rail car switch crew at the Facility.  His job duties "involved sorting rail cars using a switch engine on a rail spur" within the Facility as part of the delivery of the cars to the various processing units.  On February 29, 2008, Huntley was injured while performing switch crew duties, resulting in the amputation of one leg at the knee and additional injuries to his other leg and foot.

At the time of the incident, Bayer subscribed to a workers' compensation policy covering the employees at the Facility.  Huntley does not dispute that he was notified of the policy at the beginning of his employment in September 2005 and did not opt out of such coverage.  After the incident, Bayer notified its insurance carrier, which accepted the claim.  Huntley accepted and continues to receive workers' compensation benefits under Bayer's policy.

Huntley initially sued Bayer and several others in state court.  After a transfer of venue, Bayer filed a motion for summary judgment.  Before the motion was heard, Huntley filed a motion for nonsuit and the case was dismissed. Shortly thereafter, Huntley filed the underlying suit in federal court, alleging Bayer is liable for his injuries under the Federal Employers Liability Act[1] (FELA) and the Texas Railroad Liability Act[2] (TRLA).

---

[1] 45 U.S.C. § 51.

[2] Former TEX. REV. CIV. STAT. § 6439 (repealed 2009) (current version at TEX. TRANSP. CODE § 112.152).

3

No. 10-41276

Bayer moved for summary judgment on two grounds. First, Bayer argued that Huntley could not maintain a cause of action against it under the FELA because Bayer was not a "common carrier" under the statute as required for FELA liability. Second, Bayer contended that Huntley's receipt of workers' compensation benefits was his exclusive remedy for his injuries under the Texas Workers' Compensation Act[3] (TWCA) and that he therefore could not recover under either the FELA or the TRLA.

The district court granted the motion, holding that Bayer, as a matter of law, was not a common carrier subject to FELA liability. This holding was based on the court's following conclusions: (1) Bayer's railroad services do not link two common carriers; (2) Bayer utilizes its rail tracks to connect common carriers to other processing plants (the Lessees) on its Facility; (3) the use of its switch engines for the convenience of the Lessees and HL&P did not further the contractual obligations of a common carrier; (4) Bayer's rail services were not services that a common carrier had contracted with others to perform as part of its mission; and (5) Bayer merely connects common carriers to its Facility for the benefit of itself and its Lessees. The court did not address whether the TWCA barred Huntley's claims. Nevertheless, the court entered a final judgment based on the summary judgment order, and Huntley filed this appeal.

## II

We review the district court's grant of summary judgment de novo, applying the same standard as the district court.[4] Summary judgment is appropriate when the record reflects that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law.[5]

---

[3] TEX. LAB. CODE § 406.034.

[4] *James v. Tex. Collin Cnty.*, 535 F.3d 365, 373 (5th Cir. 2008).

[5] FED. R. CIV. P. 56(a).

No. 10-41276

"The evidence and inferences from the summary judgment record are viewed in the light most favorable to the nonmovant."[6]

## A

The FELA provides in pertinent part that "[e]very common carrier by railroad while engaging in [interstate] commerce . . . shall be liable in damages to any person suffering injury while he is employed by such carrier in such commerce . . . for such injury or death resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier."[7]  An early but still-cited Supreme Court definition of "common carrier by railroad" is "one who operates a railroad as a means of carrying for the public."[8]  A more recent definition, put forth by a district court and utilized by this court in developing considerations for identifying a common carrier, provides:

> "A common carrier has been defined generally as one who holds himself out to the public as engaged in the business of transportation of persons or property from place to place for compensation, offering his services to the public generally.  The distinctive characteristic of a common carrier is that he undertakes to carry for all people indifferently, and hence is regarded in some respects as a public servant."[9]

In *Lone Star Steel Co. v. McGee* (*Lone Star*), we discussed the longstanding recognition of classes of rail carriers that are not considered "common carriers" subject to the FELA.  For example, a company that maintains a "plant facility," i.e., "a complicated intra-plant railroad system" by which the company moves its own goods and does not offer the railroad's use to the public, is not a common

---

[6] *McLaurin v. Noble Drilling (US) Inc.*, 529 F.3d 285, 288 (5th Cir. 2008) (quotation marks and citation omitted).

[7] 45 U.S.C. § 51.

[8] *Wells Fargo & Co. v. Taylor*, 254 U.S. 175, 187 (1920).

[9] *Lone Star Steel Co. v. McGee*, 380 F.2d 640, 643 (5th Cir. 1967) (quoting *Kelly v. Gen. Elec. Co.*, 110 F. Supp. 4, 6 (E.D. Pa.), *aff'd*, 204 F.2d 692 (3d Cir. 1953)).

carrier.[10]   Common carriers are also distinguished from so-called "private carriers," described as follows:

> [A] private carrier is one who, without making it a vocation, or holding himself out to the public as ready to act for all who desire his services, undertakes, by special agreement in a particular instance only, to transport property from one place to another either gratuitously or for hire.  He carries only for persons with whom he has an initial contract, and assumes no obligation to carry for others . . . .[11]

Utilizing these general definitions and categories, we identified four considerations "of prime importance in determining whether a particular carrier is a common carrier": (1) actual performance of rail service; (2) the service being performed is part of the total rail service contracted for by a member of the public; (3) the entity is performing as part of a system of interstate rail transportation by virtue of common ownership between itself and a railroad or by a contractual relationship with a railroad, and hence is deemed to be holding itself out to the public; and (4) remuneration for the services performed is received in some manner, such as a fixed charge from a railroad or by a percent of the profits from a railroad.[12]

It is undisputed that Bayer actually performs rail service, satisfying the first *Lone Star* consideration.  However, the parties vigorously disagree as to the application of the remaining three considerations.  Bayer contends that the application thereof demonstrates conclusively that it is not a common carrier, but rather is an "in-plant carrier" that operates rail services only on its own property and in furtherance of its chemical business, and does not carry for the

---

[10] *Id.* at 644.

[11] *Id.* at 645 (quoting *Ward Transport, Inc. v. Publ Utils. Comm'n*, 376 P.2d 166, 169 (Colo. 1962)).

[12] *Id.* at 647.

No. 10-41276

general public. At most, Bayer contends, it is a "private carrier" conducting rail services for a limited number of entities pursuant to individual contracts, and thus is not a common carrier subject to the FELA. Huntley, on the other hand, argues that "Bayer's railroad provided the only link between the Lessees and the system of interstate rail transportation" and that Bayer's provision of rail services to the unrelated Lessees for a fee took Bayer out of the "plant carrier" category and rendered it a common carrier.

In applying the *Lone Star* considerations, it is helpful to review the facts in that case, including their similarities to and distinctions from the facts at hand. Like Bayer, Lone Star owned a large plant complex with an intricate system of rail trackage within the complex.[13] Various industries, whose operations were integrated with Lone Star's overall operation, maintained facilities within the plant.[14] The main railroad line of Texas & Northern Railway Company (T & N), a common carrier performing rail services for, *inter alia*, Lone Star and the other industries within the complex, extended to a "classification yard" just inside the plant.[15] And like the underlying case, additional rail service was necessary for transportation between the classification yard and the "pertinent consignee's siding or industry track."[16]

Unlike the facts at hand, however, this additional rail service was "included in the line haul freight rate charged by T & N," was provided by both Lone Star and T & N, and was charged regardless of which entity performed the service.[17] Moreover, Lone Star was essentially the sole owner of T & N—Lone

---

[13] *Id.* at 642.

[14] *Id.*

[15] *Id.*

[16] *Id.*

[17] *Id.* at 643.

7

Star owned 3,308 shares of the 3,313 common shares issued by T & N—and therefore "receive[d] in the form of dividends a part of the rate charged the industries by T & N."[18]  In holding Lone Star was a common carrier, we explained: "In light of the rail services Lone Star has performed, the fact that such services are actually rendered in fulfillment of T & N's obligations as a carrier, and giving consideration to . . . the close connection between the two companies and their mutual dependence on each other, we conclude that both Lone Star and T & N are operating, jointly, a railroad system which constitutes each of them a common carrier."[19]

The distinctions between the facts in *Lone Star* and those at hand significantly affect the second and third *Lone Star* considerations.  As to the second consideration, the service being performed by Bayer is not "part of the total rail service contracted for by a member of the public."[20]  Bayer and the Lessees each had individual contracts with Union Pacific and BNSF to transport their rail cars to and from the Facility.  There is no evidence, however, that Union Pacific and BNSF were contractually responsible to the Lessees for the rail services Bayer provided to them within the Facility; in other words, Bayer "did not provide services that the common carrier[s] had contracted to perform."[21]

We relied on a similar distinction in *McCrea v. Harris County Ship Channel Navigation District*, a case in which the District maintained railroad

---

[18] *Id.* at 647.

[19] *Id.* at 648-49.

[20] *Id.* at 647.

[21] *Kieronski v. Wyandotte Terminal R.R.Co.*, 806 F.2d 107, 110 (6th Cir. 1986) (holding that operator of railroad line on property originally owned by operator's parent company was not a common carrier, despite the fact that the railroad line connected to a common carrier and that the operator performed switching services on the property for unrelated entities that had purchased portions of the property from the operator's parent company).

trackage at two facilities where the District was responsible for unloading incoming cargo, temporary storage, and conveyance of the cargo to vessels for loading.[22] We noted that a customer shipping cargo from the facilities served by the District "does not receive the services of the . . . District by virtue of his shipment contract with a railroad"; rather, the customer was required to make independent arrangements with and pay an additional charge to the District to have the rail cars moved and unloaded.[23] Similarly, in this case the Lessees do not receive Bayer's services by virtue of their shipment contracts with Union Pacific and BNSF, and they are required to pay a separate fee under a separate contract with Bayer to have their rail cars moved to their plants within the Facility.[24]

Citing Bayer's contract with Hexion, one of the Lessees, Huntley argues that "Bayer's agreements to provide rail services to the Lessees required that it contract with the connecting railroads to move rail cars that were either sent by the public at large to the Lessees via Union Pacific or BNSF, or that were sent by the Lessees via Bayer's railroad into interstate commerce." A review of the Bayer–Hexion contract, however, demonstrates that it simply permitted Hexion to receive and ship products at the Facility pursuant to "applicable agreements with the railroad" and authorized Bayer to perform switching services at the

---

[22] 423 F.2d 605, 607-08 (5th Cir. 1970).

[23] *Id.* at 609.

[24] *See also Willard v. Fairfield S. Co.*, 472 F.3d 817, 819 (11th Cir. 2006) (rail service operator Fairfield, which had direct contracts with individual customers with facilities located on its property to transport products within the confines of the property, was not a common carrier despite the fact that it was a subsidiary of a common carrier); *Nichols v. Pabtex, Inc.*, 151 F. Supp. 2d 772, 779 (E.D. Tex. 2001) (rail operator had arrangement with common carrier whereby operator made "throughput" bids to shipping companies that included one charge for transportation, storage, loading, and unloading services, and operator allocated proceeds between itself and common carrier without customer's knowledge; thus, operator provided part of the total rail service contracted for and was itself a common carrier).

No. 10-41276

Facility for a fee.  Moreover, it is undisputed that Bayer in fact did not and does not "contract with the connecting railroads" to move the Lessees' rail cars within the Facility.  It contracts only with the Lessees for such services.  Finally, the fact that Bayer leased two sections of track outside its Facility from common carriers is immaterial, as Bayer's "right to use a portion of the track . . . w[as] merely for the convenience of the plants [within the Facility] and in no way furthered the contractual obligations of the common carrier."[25]  Thus, Bayer did not provide part of the total rail service contracted for by the Lessees.

Nor, under the third consideration, was Bayer "performing as part of a system of interstate rail transportation by virtue of common ownership between itself and a railroad or by a contractual relationship with a railroad, and hence . . . deemed to be holding itself out to the public" as a common carrier.[26] It is undisputed that there is no common ownership interest between Bayer and any railroad, including Union Pacific and BNSF.  And as discussed above, Bayer does not have a contractual relationship with Union Pacific or BNSF under which Bayer is obligated to perform any rail services.  Rather, Bayer's contracts with those two carriers involve their transportation of Bayer's rail cars to various locations throughout the country in exchange for a fee paid by Bayer. Moreover, other than the two occasions on which Bayer provided rail services to HL&P for no fee and apparently as a courtesy (by transporting rail cars owned by third parties through Bayer's property and onto HL&P's adjacent property), there is no evidence that Bayer has ever provided or offered to provide rail services to anyone other than the companies who lease land within the Facility.

---

[25] *Kieronski*, 806 F.2d at 109-10 (citing *Duffy v. Armco Steel Corp.*, 225 F. Supp. 737 (W.D. Pa. 1964)).

[26] *Lone Star Steel Co. v. McGee*, 380 F.2d 640, 647 (5th Cir. 1967).

No. 10-41276

Relying on *United States v. California*[27] and *United States v. Brooklyn Eastern District Terminal*,[28] Huntley asserts that Bayer is part of an interstate rail transportation system because Bayer's railroad provides a necessary link to common carrier railroads.　Bayer's railroad, however, is significantly distinguishable from the California-owned State Belt Railroad deemed by the Supreme Court to be a common carrier under the Safety Appliance Act in *California*, as that railroad "parallel[ed] the water front of San Francisco harbor," "extend[ed] onto some forty-five state-owned wharves," "serve[d] directly about one hundred and seventy-five industrial plants," "ha[d] track connection with one interstate railroad, and, by wharf connections with freight car ferries, link[ed] that and three other interstate rail carriers with freight yards in San Francisco leased to them by the state."[29] Nor does Bayer's railroad resemble the railroad at issue in *Brooklyn Eastern District Terminal*, in which the Terminal contracted with ten interstate railroads and several steamship companies to transport cargo between the Terminal's freight station (where the common carrier railroads began and ended) and the Brooklyn docks, and was paid by the railroad or steamship company to do so.[30] Instead, like the railroad in *Kieronski*, Bayer did not link together common carriers, but "merely connected the plants [within the Facility] in a manner typical of in-plant systems" notwithstanding the fact that it was paid separately by the Lessees to do so.[31]

With regard to the fourth consideration, receipt of remuneration for the services performed, it is undisputed that the Lessees paid Bayer directly for the

[27] 297 U.S. 175 (1936).

[28] 249 U.S. 296 (1919).

[29] 297 U.S. at 181.

[30] 249 U.S. at 301-02.

[31] *Kieronski*, 806 F.2d at 109.

11

No. 10-41276

intra-Facility rail services Bayer performed and that Bayer received no payment, either directly or indirectly, from Union Pacific or BNSF. Again, on the two occasions Bayer provided rail service to HL&P it neither charged nor received any payment. The parties strenuously disagree over whether remuneration for the rail services performed must come from a railroad, as opposed to directly from the customer, in order for the operator to qualify as a common carrier. We need not make this determination here because, even assuming remuneration by a railroad is not required, the fact that Bayer was paid by the Lessees is insufficient to transform Bayer into a common carrier under the circumstances of this case. Rather, "[t]he system looks, at most, like a private carrier arrangement, with [Bayer] holding itself out solely to those businesses that owned [plants] within the [Facility]."[32]

In sum, application of the *Lone Star* considerations demonstrates as a matter of law that Bayer was not "one who holds himself out to the public as engaged in the business of transportation of persons or property from place to place for compensation, offering his services to the public generally."[33] Bayer did not provide rail services that a common carrier was otherwise obligated to perform; did not share ownership with a common carrier; did not contract with a common carrier to provide rail services; did not link common carriers together; performed rail services within the Facility only for itself and for a small number of unrelated entities who lease property within the Facility owned by Bayer; and performed such services for the Lessees pursuant to individual contracts and assumed no obligation to carry for others. Accordingly, Bayer was not a

---

[32] *Id.* at 110; *see also Willard v. Fairfield S. Co.*, 472 F.3d 817, 822-23 (11th Cir. 2006) (noting, in finding that Fairfield was not a common carrier, that "the companies within Fairfield's property pay Fairfield directly" for rail services, "Fairfield does not collect payment from any common carrier railroad, and it does not hold itself out to the public for a fee").

[33] *Lone Star Steel Co.*, 380 F.2d at 643 (quoting *Kelly v. Gen. Elec. Co.*, 110 F. Supp. 4, 6 (E.D. Pa.), *aff'd*, 204 F.2d 692 (3d Cir. 1953)).

No. 10-41276

"common carrier by railroad" under the FELA, and the district court correctly granted summary judgment in Bayer's favor on Huntley's FELA claim.

## B

Because Bayer is not a common carrier as a matter of law, we need not address Bayer's alternative argument that the TWCA bars Huntley's FELA claim. As to the TRLA claim, in his briefing to this court Huntley did not raise or argue the issue of whether the district court erred in granting summary judgment on that claim. Accordingly, he has waived the issue.[34]

\* \* \*

For the foregoing reasons, the district court's judgment is AFFIRMED.

---

[34] *In re Southmark Corp.*, 163 F.3d 925, 934 n.12 (5th Cir. 1999); *see also United States v. Thibodeaux*, 211 F.3d 910, 912 (5th Cir. 2000) ("[I]t has long been the rule in this circuit that any issues not briefed on appeal are waived.").